# United States Court of Appeals
## For the First Circuit

---

No. 98-2143

ARNOLD W. VINICK,

Plaintiff, Appellant,

v.

UNITED STATES,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

---

Before

Stahl, Circuit Judge,
John R. Gibson,* Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Howard R. Palmer, with whom Lawrence F. O'Donnell and
O'Donnell, O'Donnell and O'Donnell, were on brief, for
appellant.
Teresa E. McLaughlin, Attorney, with whom Loretta C.
Argrett, Assistant Attorney General, and Gilbert S. Rothenberg,
Attorney, were on brief, for appellee.

---

March 8, 2000

---

_____
*Of the Eighth Circuit, sitting by designation.

**STAHL, Circuit Judge**.  Plaintiff-appellant Arnold W. Vinick appeals the district court's determination that he personally is liable for withholding taxes that Jefferson Bronze, Inc. ("Jefferson Bronze") failed to pay.  Previously this court vacated a determination that Vinick was a "responsible person" within the meaning of section 6672(a) of the Internal Revenue Code and remanded for further proceedings consistent with our opinion.  See Vinick v. United States, 110 F.3d 168 (1st Cir. 1997) (appeal from summary judgment in the government's favor) (hereinafter Vinick I).  Following a bench trial, the district court again ruled in the government's favor by finding Vinick to be a responsible person.  We reverse.

## I.

### A.

To ease the logistical burden on employees and to aid in the collection of taxes, the Internal Revenue Code requires employers to withhold from employees' wages social security and federal income taxes.  See 26 U.S.C. §§ 3102, 3402 (1994).  The money withheld is held by the employer in trust for the United States.  See id. § 7501.  This system protects from later recourse the employees who are deemed to have paid their taxes, even if the employer fails to pay the Internal Revenue Service ("IRS") the money it withheld.  See Caterino v. United States,

794 F.2d 1, 3 (1st Cir. 1986) (noting that the IRS "has no recourse against employees who have had income and social security taxes withheld from their wages"). The Code renders liable for the taxes due those it deems to be responsible persons who willfully have neglected to pay the withheld money. See 26 U.S.C. § 6672. In pertinent part, § 6672 states:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

Liability under § 6672 falls upon those persons who satisfy both prongs of a two-part inquiry. First, the person must be "responsible" for collecting, accounting for, and paying over the taxes; second, if, and only if, the person is deemed responsible, he is liable if he acted "willfully" within the meaning of this section. See, e.g., Vinick I, 110 F.3d at 170; Caterino, 794 F.2d at 3; Harrington v. United States, 504 F.2d 1306, 1312-13 (1st Cir. 1974). Because we already have determined as a matter of law that Vinick acted willfully, see Vinick I, 110 F.3d at 174, the only issue before us is whether

-4-

the record supports the district court's conclusion that Vinick was in fact a responsible person.  We hold that it does not.

**B.**

We review the record in the light most favorable to the government.  See United States v. Ven-Fuel, Inc., 758 F.2d 741, 744-45 (1st Cir. 1985) (noting that "we present the facts and the reasonable inferences therefrom in the manner most hospitable to the appellee, to the extent consistent with record support").

Vinick, a certified public accountant, has been in private practice since 1962.  Prior to that time, he worked for the IRS for eight years.  While in private practice, Vinick became acquainted with Richard M. Letterman, then a practicing attorney.[1]  In 1981, Letterman, Peter Mayer, and Vinick formed Jefferson Bronze for the purpose of operating a foundry.  Norman Leach, who owned a foundry in Salem, Massachusetts, sold them the necessary assets.  Letterman was Leach's attorney, Vinick was his accountant, and Mayer was Letterman's brother-in-law.

Jefferson Bronze received from the Small Business Administration ("SBA") a loan to acquire the assets from Leach.

---

[1] In 1992, Letterman pled guilty to four counts of larceny and one count of embezzlement by a fiduciary.  He subsequently was disbarred and received a two-year prison sentence.  The charges were unrelated to his involvement in Jefferson Bronze.

Letterman, Mayer, and Vinick, who each owned one-third of Jefferson Bronze's stock, personally guaranteed the SBA loan and pledged their homes as collateral. Letterman became the president and clerk. Vinick was the treasurer. Mayer was neither an officer nor a director, but he was the day-to-day manager of the foundry.

Throughout the history of his involvement in the corporation, Vinick never gave up his accounting practice and never had an office at Jefferson Bronze. Although Letterman and he both were signatories on the company's checking accounts, Vinick never signed checks prior to the company's filing of its Chapter 11 petition. Vinick, however, did prepare the corporation's quarterly employment tax returns.

Soon after its formation, Jefferson Bronze began what would become a long period of financial difficulties. Early on, in 1983, Letterman fired Mayer, and he and Vinick then acquired Mayer's share of the corporation, obtained his release from liability on the SBA loan, and each became a half owner of Jefferson Bronze. Subsequently, Vinick asked Ronald Ouellette, who had worked in the foundry under Leach, to take over as the new manager.

Ouellette ran the office and the foundry, and his wife Diane Ouellette worked part time as the bookkeeper in the office

and signed the company checks and payroll returns. Vinick occasionally would visit the Ouellette home to collect information needed to complete the quarterly returns. After their preparation, Vinick would return the completed, unsigned forms to the Ouellette home. Usually once a month, Vinick would discuss with Ron Ouellette the financial condition of the corporation and would stress to him the need to pay the taxes.

During Ouellette's tenure as manager, Jefferson Bronze's financial troubles continued. Often, the corporation failed timely to pay the withholding taxes due. Regardless, the corporation always filed its tax returns on time. At some point, Letterman and Vinick obtained from Leach a $35,000 loan, which they secured with personal guarantees. In 1985, Vinick negotiated with an IRS revenue officer a payment plan for the taxes Jefferson Bronze owed. Vinick relayed to Ouellette the terms of the plan, and Ouellette complied with the plan's requirements. After Jefferson Bronze completed payment of these taxes, it experienced no further tax delinquency until Letterman took over as manager.

In January 1988, Letterman decided on his own to take over as the day-to-day financial manager of the corporation. Letterman moved his law practice to Jefferson Bronze's office and relieved Ouellette of his financial responsibilities, but

retained him as the foundry manager. Letterman's wife, Ellen Letterman, took over as office manager and bookkeeper. Vinick continued to collect the financial information, to prepare the tax returns, and to leave them for Letterman to sign. While he also continued to advise Letterman to pay the corporation's taxes, the record is undisputed that Vinick became less involved in the financial affairs of the corporation as Letterman's role increased.

In May 1988, Jefferson Bronze refinanced its SBA loan with a $300,000 loan from National Grand Bank. Letterman and Vinick met with the bank's vice president, Eliot Rothwell, who negotiated the loan. The bank's practice required all principals of any closely held corporation to be account signatories, and it made no exception for Jefferson Bronze. Letterman and Vinick each signed the note evidencing the loan twice, once in an individual capacity and once in a corporate capacity. Each further personally guaranteed the loan by pledging his house as collateral. Around March 1989, the corporation became delinquent on its loan from National Grand Bank, and Letterman and Vinick met with Rothwell to discuss the financial future of Jefferson Bronze.

By July of 1990, the company's continuing financial difficulties forced it to file for bankruptcy protection under

Chapter 11. After doing so, it opened two new bank accounts at Heritage Cooperative Bank ("Heritage"): a debtor in possession account and a tax account. Both accounts required two signatures, Letterman's and Vinick's, on every check, even though Letterman retained possession of the checkbooks. For the first time in Jefferson Bronze's existence, Vinick's signature appeared on Jefferson Bronze checks.

In 1990, during the bankruptcy period, Vinick signed every check on the Heritage accounts, but it is unclear when he signed them. On several occasions, Juli Young, the bank employee who filed all paid checks, called Vinick down to the bank. Upon arrival, she presented to him for his signature checks that the bank already had negotiated with only Letterman's signature.[2] On July 26, 1991, National Grand Bank foreclosed on its loan. Later that year, Jefferson Bronze finally closed its doors.

---

[2]These checks were the subject of much dispute during the trial because testimony about whether Vinick signed the checks before or after the bank negotiated them was conflicting. Vinick testified that he signed all checks after the bank had negotiated them, but bank employees recalled that the bank had negotiated some of the checks with Vinick's signature already affixed. The district court did not resolve this dispute; the judge merely stated that Vinick had signed some before and some after negotiation, and further found the fact of Vinick's signing, regardless of when, to be indicative of his authority and responsibility within the meaning of § 6672.

Meantime, from April 1989 to June 1990, during Letterman's tenure as manager and prior to Vinick's ever having signed a company check, Jefferson Bronze again fell behind in its withholding tax obligations. On December 17, 1990, the IRS assessed against Vinick a penalty pursuant to § 6672 for the total amount owed, $49,129. The assessment alleged failed withholding payments for the last three quarters of 1989 and the first two quarters of 1990. On December 24, 1990, the IRS made a like assessment against Letterman.

Vinick paid $3,731 and filed a claim for a refund. The IRS denied that claim, and Vinick commenced this suit. The government counterclaimed for the balance due and moved for summary judgment against both men. The district court concluded that as a matter of law Letterman and Vinick both were responsible persons who acted willfully under § 6672. The court thus granted the government's motion for summary judgment. Vinick alone appealed. In <u>Vinick I</u>, we found a genuine issue of material fact as to whether Vinick was a responsible person and remanded for a bench trial on the issue that is the subject of this appeal.

During a two-day bench trial to determine whether Vinick was a responsible person, the court heard testimony from several witnesses about the company's organizational structure

and about the financial operations at Jefferson Bronze. That testimony covered the formation of the corporation, the various management changes, the operation of the company under each manager, its financial difficulties, and its bankruptcy. The court received into evidence over Vinick's objection over 200 canceled checks from the two Heritage accounts, which Jefferson Bronze had opened after the relevant quarters.

After the second day of testimony, the court issued a bench opinion, finding by a preponderance of the evidence[3] that Vinick was a responsible person within the meaning of § 6672. The court found that he was the treasurer, prepared the quarterly tax returns, negotiated with the IRS on behalf of the corporation, pledged personal assets, had authority to participate in employment decisions, and possessed throughout the corporation's existence check-signing authority. The court also found that he actually exercised this authority only while the corporation was in bankruptcy. The court weighed each of these factors to varying degrees in favor of his being a

---

[3]The district court noted upon rendering its findings and judgment that because the standard of proof is by a preponderance of the evidence, it is immaterial which side has the burden of proof. We have held that "[a]lthough the rule appears harsh, as in other tax litigation a person who challenges a section 6672 assessment bears the burden of persuasion to prove lack of control." Caterino, 794 F.2d at 5.

responsible person.  The court did find him to be uninvolved in the day-to-day management of the corporation and weighed this factor against his being a responsible person, noting, however, that its weight was minimal.  Vinick now appeals.

## II.

In reviewing factual findings, this court applies the clear-error standard of review.  See Fed. R. Civ. P. 52(a). Under this standard, we accept the district court's findings of fact unless we are "'left with the definite and firm conviction that a mistake has been committed.'"  Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)); see also Brown Daltas & Assoc., Inc. v. General Accident Ins. Co., 48 F.3d 30, 36 (1st Cir. 1995).  Moreover, we usually defer to a trial court's resolution of mixed questions of law and fact. See, e.g., United States v. Howard (In re Extradition of Howard), 996 F.2d 1320, 1328 (1st Cir. 1993) ("The standard of review applicable to mixed questions usually depends upon where they fall along the degree-of-deference continuum: the more fact-dominated the question, the more likely it is that the trier's resolution of it will be accepted unless shown to be clearly erroneous.").

But, the case for deference vanishes when a court's ultimate conclusion is infected by legal error. See Inwood Labs. v. Ives Labs., 456 U.S. 844, 855 n.15 (1982) ("Of course, if the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard."); Brown Daltas, 48 F.3d at 36 (same); Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 153 (1st Cir. 1990) ("It is settled that one way around the rigors of the 'clearly erroneous' rule is to show that the trial court mistook the applicable law."). As a result, when a trial court "premise[s] its ultimate finding . . . on an erroneous interpretation of the standard to be applied," we do not use clear-error review. United States v. Parke, Davis & Co., 362 U.S. 29, 44 (1960). Instead, we treat the trial court's conclusion as a question of law. See United States v. Singer Mfg. Co., 374 U.S. 174, 194 n.9 (1963) ("Insofar as that conclusion derived from the court's application of an improper standard to the facts, it may be corrected as a matter of law."); Parke, Davis, 362 U.S. at 44 (noting that in these circumstances, the appeals court is "reviewing a question of law, namely, whether the District Court applied the proper standard to essentially undisputed facts"); Bergersen v. Commissioner, 109 F.3d 56, 61 (1st Cir. 1997) (noting that with

-13-

mixed questions of law and fact "once the raw facts are determined (and such determinations are normally reviewed only for clear error), deciding which legal label to apply to those facts is a normative decision--strictly speaking, a legal issue").

Because the trial court made its findings of fact based on a misunderstanding of the legal standard for what constitutes a responsible person under § 6672 in that it considered Vinick's conduct over the entire period he was involved with Jefferson Bronze rather than his activities during the quarters in question, see infra Part III.B, we do not defer to its conclusion that Vinick was a responsible party within the meaning of the statute.[4]

**III.**

**A.**

A responsible person[5] under § 6672 is anyone within a company who has a duty to collect, account for, or pay the

---

[4]The dissent argues that we have altered the standard of review applicable to § 6672 cases as set forth in Caterino. We have not. We agree that this court ordinarily should review the trial court's responsible person determination for clear error; however, when the fact-finder misunderstands the applicable legal standards, the case for deference disappears.

[5]This term does not appear in the statute itself, but courts long have referred to the persons subject to liability under § 6672 as "responsible persons." See, e.g., Slodov v. United States, 436 U.S. 238, 245 n.7 (1978).

withheld taxes.[6]  See Vinick I, 110 F.3d at 172.  In determining who falls within the category of responsible person, the courts have identified seven typically used, but nonexclusive, indicia. The inquiry focuses on whether the individual

> (1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority.

Fiataruolo v. United States, 8 F.3d 930, 939 (2d Cir. 1993); accord Barnett v. IRS, 988 F.2d 1449, 1455 (5th Cir. 1993); Denbo v. United States, 988 F.2d 1029, 1032 (10th Cir. 1993); Brounstein v. United States, 979 F.2d 952, 954-55 (3d Cir. 1992); Thomsen v. United States, 887 F.2d 12, 16 (1st Cir. 1989); Gephart v. United States, 818 F.2d 469, 473 (6th Cir. 1987).  No single factor is determinative of responsibility. See Barnett, 988 F.2d at 1455.  The deciding court must look at

---

[6]While the Code defines a responsible person as one who is "required to collect, truthfully account for, and pay over any tax," 26 U.S.C. § 6672(a) (1994), the Supreme Court has interpreted the statute to apply to any person who has a duty to do any one of those things, see Slodov, 436 U.S. at 250 (concluding that Congress meant this phrase "to limit § 6672 to persons responsible for collection of third-party taxes and not to limit it to those persons in a position to perform all three of the enumerated duties").

the "totality of the circumstances" when making the determination of responsibility. <u>Fiataruolo</u>, 8 F.3d at 939 ("The question of control over the employer's finances must be answered in light of the totality of the circumstances; no one factor is determinative.").

Because the goal of the statute is to hold liable for the nonpayment of withholding taxes the party responsible for such payment, the "crucial inquiry is whether the person had the 'effective power' to pay the taxes--that is, whether he had the actual authority or ability, in view of his status within the corporation, to pay the taxes owed." <u>Barnett</u>, 988 F.2d at 1454; <u>see</u> <u>also</u> <u>Raba</u> v. <u>United States</u>, 977 F.2d 941, 943 (5th Cir. 1992) ("The crucial examination is whether a person had the effective power to pay taxes." (internal quotation marks and citation omitted)). While these factors largely are self-explanatory, it is important to elaborate upon them to resolve whether Vinick was a responsible person in light of the facts as found. The factors easily divide into the following three groups: (1) those that identify the taxpayer's status within the corporation, (2) those that identify his involvement in the daily affairs of the corporation, and (3) those that identify his involvement in the financial affairs of the corporation. We turn now to each of these groups.

**1.**

The first two factors contemplate the taxpayer's status within the corporate structure. As an initial matter, we note that titular authority is insufficient to create liability. See Caterino, 794 F.2d at 5 (noting that courts "have fashioned an elastic definition predicated upon the function of an individual in the employer's business, not the level of the office held"); see also Fiataruolo, 8 F.3d at 939 ("[T]he significant control test is not meant to ensnare those who have merely technical authority or titular designation."). Moreover, "[t]he requisite exercised authority or duty is particularly lacking in a case . . . where the taxpayer assumes a title merely for the purpose of protecting his investment." O'Connor v. United States, 956 F.2d 48, 51-52 (4th Cir. 1992).

Like corporate title, share ownership is a factor, but not all shareholders are responsible persons. See id. ("To ignore [the separation of ownership and authority] would be to envelop within 'responsible person' all significant investors with titles in corporations which fail to pay their withholding taxes."). Furthermore, share ownership is not a predicate to finding responsibility. See Donelan Phelps & Co. v. United States, 876 F.2d 1373, 1376 (8th Cir. 1989) (noting that a responsible person "need not be an officer or director or

shareholder or employee or disbursing officer or payroll clerk of the trustee of the funds deducted from the employees' wages").

## 2.

The next two factors focus on the taxpayer's involvement in the operation of the corporation. The first factor is whether the taxpayer is active in the day-to-day affairs of the company. Day-to-day management in a corporation involves more than simply having some tangential involvement in the corporation's business. See Godfrey v. United States, 748 F.2d 1568, 1575 (Fed. Cir. 1984). The Godfrey court described what day-to-day management means:

> [The taxpayer] actively conducted the day-to-day operations of the business: he came to the office daily, hired and laid off employees, ordered materials and supplies, conducted business correspondence, set the price of jobs, negotiated all contracts with customers, prepared invoices, disbursed corporate checks signed by him and the secretary-treasurer in payment of supplier's [sic] bills and other business expenses, and deposited the business receipts in the corporation's bank account. His address was used for receiving most business mail; his signature was required on all corporate checks.

Id. (describing activities of the taxpayer in White v. United States, 372 F.2d 513 (Ct. Cl. 1967)). Given the depth of involvement required for day-to-day management, occasional

involvement in business affairs is insufficient to create liability. See id. at 1575-76.

The next factor is whether the taxpayer has the ability to hire and fire the employees. In essence, this factor assists in determining the taxpayer's level of involvement in the daily operations of the company. Cf. Thibodeau v. United States, 828 F.2d 1499, 1504 (11th Cir. 1987) ("The government claims that, as president, the taxpayer was responsible for running the corporation on a daily basis, including the hiring and firing of all employees."); White, 372 F.2d at 515 (listing with his other daily operational duties the taxpayer's responsibility for hiring and firing all employees). The theory is that a person with authority to hire and fire the employees likely is involved substantially in the day-to-day management of the company.

### 3.

The final three factors assess involvement in the financial operations of the corporation. This inquiry is the heart of the matter because it identifies most readily the person who could have paid the taxes, but chose not to do so. See Morgan v. United States, 937 F.2d 281, 284 (5th Cir. 1991) ("The central question is whether an individual had the effective power to pay taxes."); Hochstein v. United States, 900 F.2d 543, 547 (2d Cir. 1990) ("The central question, however, is

whether the individual has significant control over the enterprise's finances."). Of the three factors within this central question, the first, whether the taxpayer has decision-making authority, is the most important because the goal of § 6672 is to fix liability on those persons who could have and should have remitted taxes to the IRS. See Caterino, 794 F.2d at 5 (noting that the inquiry for responsibility is "whether the person had the power to determine whether the taxes should be remitted or paid or had the final word as to what bills should or should not be paid and when" (internal quotation marks and citation omitted)); see also Greenberg v. United States, 46 F.3d 239, 243 (3d Cir. 1994) (finding responsible a taxpayer who "wrote checks to pay other creditors while knowing that withholding tax liabilities to the United States remained unpaid"); Denbo, 988 F.2d at 1032 ("[A] corporate officer or employee is responsible if he or she has significant, though not necessarily exclusive, authority in the general management and fiscal decisionmaking of the corporation." (internal quotation marks and citation omitted)); Gephart, 818 F.2d at 473 (noting that the test focuses "upon the degree of influence and control which the person exercised over the financial affairs of the corporation and, specifically, disbursements of funds and the priority of payments to creditors"); Commonwealth Nat'l Bank v.

United States, 665 F.2d 743, 757 (5th Cir. 1982) ("A responsible person is one who has a final or significant--even if not exclusive--word as to which bills or creditors should be paid."); White, 372 F.2d at 517 (noting that a responsible person usually is one "with ultimate authority over expenditures of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes"; one with "authority to direct [the] payment of creditors").

The second of these factors, whether the taxpayer exercised control over the daily bank accounts, is significant because it distinguishes between the officers with general control and those with financial control. See Hochstein, 900 F.2d at 547 ("[T]he district court incorrectly focused on [taxpayer's] control over [the company's] operations generally, rather than his control over the finances of the corporation."). Financial involvement indicates that the taxpayer not only was involved in the daily management of the company, but also knew the financial circumstances and could have paid the government.

The final factor is whether the taxpayer had check-signing authority. Again, this factor is significant because it helps determine whether the taxpayer actually could have paid

-21-

the IRS the due taxes. Importantly, "[c]ase law discloses that authority to sign checks, without more, is a weak pillar on which to rest a liability determination that a person is properly subject to a 100 percent penalty under section 6672." Barrett v. United States, 580 F.2d 449, 453 (Ct. Cl. 1978). The check-signing inquiry goes beyond the simple question whether the taxpayer was a signatory; rather, the court must look at the check-signing authority in the context of financial control. See United States v. Carrigan, 31 F.3d 130, 134 (3d Cir. 1994) (noting that a president's having and even exercising on occasion signatory authority, without more involvement in the company's financial affairs, does not as a matter of law make him a responsible person). Possession of the authority without its exercise is not enough. See O'Connor, 956 F.2d at 51 ("The substance of the circumstances must be such that the officer exercises and uses his authority over financial affairs or general management, or is under a duty to do so, before that officer can be deemed to be a responsible person."); Morgan, 937 F.2d at 284-85 ("Mere access to corporate funds, however, does not make one a responsible person."); Pototzky v. United States, 8 Cl. Ct. 308, 316 (1985) (holding that a corporate officer who no longer exercised his authority as a signatory even though he

"technically had the authority to sign" was not a responsible person).

Having established the background and having explained the operation of the indicia of responsibility, we turn to discuss this particular case.

**B.**

As previously mentioned, our task is not to determine whether the district court's factual findings were correct given the weight of the evidence on each factual dispute involved. Rather, the issue is whether Vinick's level of corporate involvement suffices to render him a responsible person under § 6672. Therefore, our task is to decide whether the district court understood the legal standard for what is required to be a responsible person and correctly applied this legal standard to its findings when making its ultimate conclusion. We hold it did not and that it should have entered judgment for Vinick. See Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 647 (2d Cir. 1998) (remanding with instructions to enter judgment for the appellee when there was insufficient evidence to support the district court's judgment and no further proceedings were required).

As we have discussed, the central question in determining whether a taxpayer is a responsible person is

whether he had the power to pay the taxes during the quarters in question. See Barnett, 988 F.2d at 1454. In Vinick I, we limited the inquiry of responsibility to "the relevant quarters."[7] Vinick I, 110 F.3d at 172 (focusing attention on the relevant quarters and noting that while Vinick participated in some business activities, "neither of those incidents occurred during the quarters in question"). At oral argument, the government contended that evidence of activities outside the quarters in question bears on whether Vinick had authority during the quarters in question. We disagree. Responsibility during one period does not equate to responsibility in all periods. See Caterino, 794 F.2d at 4 (finding that the taxpayer's "involvement with [the company] was insufficient to make him 'responsible' for 1973 under section 6672, but was sufficient to make him 'responsible' for the first two quarters

---

[7]A review of the district court's Findings and Conclusions is troubling because of its reliance on Vinick's activities outside the quarters in question. Indeed, it leaves us with the impression that the court relied almost entirely on Vinick's activities before and after the relevant quarters. Twice in Vinick I we emphasized that an inquiry into liability under § 6672 should focus on the taxpayer's activities during the quarters in question, see Vinick I, 110 F.3d at 172 (dismissing findings that Vinick engaged in managerial activities because they did not occur during the quarters in question), and we reiterate that principle here. When determining whether a taxpayer is a responsible person under § 6672, the court should focus its inquiry on the quarters during which the taxes were unpaid.

of 1974").    As we review the record, we can identify several distinct eras of corporate governance.  The first followed Letterman's, Mayer's, and Vinick's initial purchase of Jefferson Bronze, during which time, 1981 to 1983, Mayer was the day-to-day manager.  The second came with Ouellette's tenure as day-to-day manager, which was from 1983 to 1987.  The third, which includes the quarters in question, began with Letterman's taking over the daily operations in 1987 and ended when the company filed for bankruptcy in July 1990.  The final period began with the filing of bankruptcy, during which time the company had opened the Heritage accounts, and ended with the company's failure in 1991.  The latter two phases were particularly significant.  Letterman's management of the business was more concentrated in his hands than it had been in those of his predecessors.  Moreover, when Jefferson Bronze filed for bankruptcy, not only was Letterman's control a factor, but also the bankruptcy court's oversight into the company's affairs would bear upon the degree of control that either Letterman or Vinick could have had.  Because of the differences in the governance of Jefferson Bronze, it is erroneous to conflate responsibility during one era with responsibility during another.

All the factors involved in making the legal determination of responsibility are designed to focus attention on the central question of power. At no time did Vinick exercise any decision-making authority over which creditors Jefferson Bronze paid. Moreover, the government's evidence indicates that during the quarters in question, Letterman was in charge of the day-to-day operations. While it is true that more than one person can be responsible, see Harrington, 504 F.2d at 1312 (noting that we hold responsible "all with responsibility and authority to avoid the default which constitutes a violation of the statute"), the government introduced no evidence indicating that during the relevant quarters, Vinick had any involvement in the day-to-day operations. Unless titular authority, being a shareholder, and having unexercised check-signing authority suffice to render a taxpayer responsible, no evidence supports holding Vinick as such.

It is with these observations that we discuss the district court's legal conclusions about Vinick's responsibility.

Initially, the court found that Vinick was the corporation's treasurer. In commenting that the fact of title is determinative, the court concluded that position alone favors finding Vinick to be a responsible person. Here, the district

court contravened the message of <u>Vinick I</u>, in which we said that we "predicate our definition of who is a responsible person on the function of the employee in the business, and not the level of the office held."  <u>Vinick I</u>, 110 F.3d at 172; <u>see</u> <u>also</u> <u>Caterino</u>, 794 F.2d at 5 (noting that courts consider a person's actual office function rather than his title); <u>White</u>, 372 F.2d at 516 ("[T]he courts tend to disregard the mechanical functions of the various corporate officers and instead emphasize where the ultimate authority for the decision not to pay the tax lies.").  The court then compounded its error by determining that being treasurer "gives him authority to do many things that he does not necessarily have the responsibility to do."  Instead of focusing on his unexercised authority and his titular designation, the court should have looked at the substance of

Vinick's work <u>as treasurer</u>[8] to determine what bearing on responsibility this titular authority should have.

The government contended at oral argument that simply being an inside director is sufficient to make a person responsible because directors owe the company a fiduciary duty to see to it that the taxes are paid. This position is contrary to the caselaw. <u>See</u> <u>O'Connor</u>, 956 F.2d at 51-52; <u>Godfrey</u>, 748 F.2d at 1576. In <u>O'Connor</u>, the taxpayer was a fifty-percent shareholder, the vice-president, and a director of a closely held corporation, but did not exercise any authority. <u>See</u> <u>O'Connor</u>, 956 F.2d at 51. The court held that, even though he

---

[8]Vinick's acting "as treasurer" is important because he was and is a Certified Public Accountant ("CPA"). The district court determined that his activities over the years of the company's existence in preparing the taxes, meeting with the IRS to negotiate the settlement in the early years, preparing the quarterly employment tax returns, and recommending that the withholding taxes be paid were activities within his capacity as treasurer. These activities are also those that a professional CPA would undertake to service his client. Indeed, Ellen Letterman, in her testimony, discussed her relationship with Vinick: "Well, he was the CPA and I would give him all the money information he needed."

The government has suggested that Vinick's telling Letterman and the other managers to pay the taxes demonstrates his responsibility. Giving this advice is, after all, typically a part of the CPA's or attorney's function. But this advice coupled with an investment interest and a corporate title is insufficient to render that professional a responsible person because it does not demonstrate an ability to decide which creditors are paid. If anything, the rendering of advice would support a determination of willfulness, but that inquiry begins only after the determination of responsibility is made. <u>See</u> <u>Vinick I</u>, 110 F.3d at 170.

was a director, "O'Connor was a 'silent' investor who did not exercise authority and was under no duty to do so." Id. Similarly, in Godfrey, the taxpayer was the chairman of the board, had taken the lead in attempting to avoid insolvency, had negotiated for loans, had sold corporate assets, and otherwise had participated in the daily operations of the business. See Godfrey, 748 F.2d at 1576. In deeming these activities insufficient to render him a responsible person, the Federal Circuit noted that "[t]o hold Godfrey a 'responsible person' on the present record would be to hold as a 'responsible person' every board chairman who took an active interest in the solvency of the corporation he serves." Id.

The district court also determined that Vinick's having check-signing authority weighed heavily in favor of finding responsibility. The court's affording such weight to the check-signing factor without regard to whether check-signing authority was indicative of financial control is contrary to § 6672 precedent. Cf. Denbo, 988 F.2d at 1032 (finding a taxpayer with check-signing authority responsible because of his regular involvement in the financial management of the corporation). In other words, whether the taxpayer had check-signing authority is relevant, but only insofar as it demonstrates financial control. The central inquiry is whether Vinick could have paid the taxes.

See Morgan, 937 F.2d at 284; White, 372 F.2d at 517.  While it is true that he had check-signing authority during the quarters in question, he at no time had access to the checkbook during that period, see Vinick I, 110 F.3d at 172, and thus he was not in a position to exercise his authority, which is determinative. See Carrigan, 31 F.3d at 134 (noting that the taxpayer's check-signing authority did not render him a responsible person because "the corporate books, records and checkbooks were locked in an office, and [the taxpayer] did not have his own key"); Dudley v. United States, 428 F.2d 1196, 1202 (9th Cir. 1970) (noting that the taxpayer "did not have control over the payment of checks," which indicated his lack of control over the finances of the corporation).

The court ignored Vinick I's instructions to focus on the quarters in question and admitted much evidence about Vinick's signing of checks post Chapter 11, weighing that fact heavily in favor of finding responsibility.  This evidence does not bear on the inquiry into responsibility during the relevant quarters.  See Vinick I, 110 F.3d at 172-73.  Even if it were appropriate to consider evidence from later quarters, the intervention of the Chapter 11 proceeding significantly changed this equation.  Vinick's role, limited before the bankruptcy, was only slightly more active after it.  The fact of the

bankruptcy renders meaningless any comparison of these two periods. To the extent the district court considered the evidence of Vinick's signing checks after the quarters in question, it erred.

Assuming arguendo that Vinick's signing the Heritage checks had some relevance, being a countersignatory does not suffice to make him a responsible person. See Lee v. United States, 89-2 U.S. Tax Cas. (CCH) ¶ 9393, at 89,018 (D. Haw. Apr. 26, 1989) (noting that even though the taxpayer "had the authority to countersign checks . . ., she did not have any authority to decide which creditors were to be paid" and thus was not a responsible person); Montana v. United States, 76-1 U.S. Tax Cas. (CCH) ¶ 9145, at 83,159 (D. Neb. Nov. 18, 1975) (noting that in cases finding countersignatories to be responsible persons, "the taxpayer's power to sign checks was merely a manifestation of his control over the management and disbursement of corporate funds"); Last v. United States, 65-1 U.S. Tax Cas. (CCH) ¶ 9244, at 94,926 (E.D.N.Y. Feb. 9, 1965) (finding the taxpayers not to be responsible persons even though they "continue[d] to countersign checks" during the period in question).

The court found that Vinick's previous negotiation with the IRS and interaction with financial institutions weighed in

favor of responsibility.  Again, the district court should not have relied on this evidence because Vinick did not engage in these activities during the quarters in question.  See Vinick I, 110 F.3d at 172.  And even in the case of the IRS settlement, it was the manager, not Vinick, who saw to the fulfillment of its terms.  As the government noted in its brief, "[a]fter these taxes were paid, there was no further delinquency during Ouellette's tenure."  It is at this point that Letterman took over management, and Vinick's role, already slight, became minimal.[9]

The district court weighed in favor of responsibility Vinick's investment in the corporation.[10]  This finding does not fit within the typical litany of § 6672 factors, see Thomsen, 887 F.2d at 16, and is not relevant.  While making a personal

---

[9]A person's decision to become involved in loans and refinancing but not in the payment of taxes can demonstrate willfulness, which is the second prong of the § 6672 inquiry, but does not demonstrate responsibility.  See Caterino, 794 F.2d at 6 ("Any responsible person who knows the taxes are not paid and allows the business to pay other creditors acts willfully." (emphasis added)).  For example, in Godfrey, the taxpayer took an active interest in the company's solvency, but not in the payment of taxes.  The court correctly noted that his "knowledge of nonpayment may be relevant to the issue of willfulness, but it is irrelevant in considering the question of whether he was a 'responsible person.'"  Godfrey, 748 F.2d at 1576 (citation omitted).

[10]The court stated that the form of the personal contribution, that is, whether he pledged personal assets or made a personal guarantee to secure financing for Jefferson Bronze, was irrelevant.  It was the mere fact of contribution that the court weighed in the responsibility calculus.

investment shows a level of involvement in the corporation, it does not indicate _financial_ control, and determining whether Vinick has _financial_ control is the aim of the § 6672 inquiry. Because individual investors in corporations by definition use their personal assets to make their investment, the court's conclusion would render any investor in a closely held corporation a responsible person. Because this finding does not serve to limit the scope of who could be a responsible person, it has no bearing on the § 6672 inquiry.

The district court found that Vinick had authority to participate in the hiring and firing decisions at Jefferson Bronze. The court weighed this factor in favor of his being a responsible person and deemed it irrelevant that he never actually exercised that authority. As discussed above, the proper inquiry focuses on whether Vinick was involved in the daily management of the corporation, which routine hiring and firing of employees would indicate. The court did not find that Vinick routinely made personnel decisions. The only finding is that he had "authority to participate" in these decisions regarding only the general manager. Again, such authority is insufficient to render him a responsible person, see Godfrey, 748 F.2d at 1576 (noting that the taxpayer who "participated in the hiring and firing of top corporate management" was not a responsible person), because it does not demonstrate any

-33-

significant control over the daily operations, especially the financial operations, of the corporation.

The final finding of the district court is that Vinick had little involvement in the daily management of the corporation. The court then gave this determination minimal weight because it was "so far below the combined weight of the [other] factors." The court gave this finding short shrift in contravention of accepted authority. See O'Connor, 956 F.2d at 51. At the heart of the question whether a taxpayer is a responsible person lies an analysis of his influence and control in the corporation and in its financial affairs. See id. That Vinick did not have any involvement in the daily operation of the corporation is much more significant than his title, for example, because it demonstrates his inability to exercise any degree of significant control over which creditors the company would pay.

Taking all of these factors together, the findings of the district court do not support the ultimate conclusion that Vinick is a responsible person.[11]

---

[11]The government notes that the Tenth Circuit's Denbo decision has similar facts to those in this case. While it is true the Tenth Circuit found there was sufficient evidence to find Denbo a responsible person, see Denbo, 988 F.2d at 1033, the case is distinguishable. Denbo was a fifty percent shareholder, was the secretary-treasurer, was a director, did not manage the restaurant's daily operations, pledged personal assets for the corporation, arranged financing for the corporation, and had check-signing authority, which he never

-34-

While Vinick may have been more than a mere passive investor in the corporation, this fact alone is insufficient to render him a responsible person.  See Godfrey, 748 F.2d at 1576 ("Godfrey's activities were not those of a passive 'above the fray' chairman, but they do not, without more, impose or create the 'duty' expressly described in the statute.").  Absent a finding that Vinick possessed actual, exercised authority over the company's financial matters, including the duty and power to determine which creditors to pay, as a matter of law he cannot be a responsible person.

## IV.

For the reasons stated, we find that Vinick as a matter of law was not a responsible person within the meaning of 26 U.S.C. § 6672(a).  We therefore reverse and remand the case to

---

exercised.  See id. at 1032.  He also "held regular meetings with [his co-owner] and the accountants."  Id.  As the Tenth Circuit noted, "[Denbo's] financial involvement in the corporation, along with his check-signing authority, gave him the effective power to see to it that the taxes were paid."  Id. at 1033.

In contrast, Vinick's role in the financial activities of the corporation was largely as its accountant, unlike Denbo who actively engaged in actual financial management of the corporation.  When Letterman became Jefferson Bronze's manager, Vinick's role in the corporation substantially lessened.  Moreover, to the extent Vinick, as Jefferson Bronze's accountant, was involved in the corporation's financial affairs, such involvement demonstrates only his willfulness because it shows he knew that on occasion the taxes had not been paid, but does not demonstrate his power to pay them, which a determination of responsibility requires.

the district court with instructions to enter judgement in favor of Vinick.  **Reversed and remanded.**

Dissent follows.

**LYNCH, Circuit Judge, dissenting**.  I dissent in this case, despite great respect for my brethren, because I believe the majority opinion is based upon significant errors of law.

A.  Inconsistency With Prior Decision

In Vinick v. Commissioner, 110 F.3d 168 (1st Cir. 1997) ("Vinick I"), this court twice stated that the facts presented in this case would permit a reasonable inference that Arnold W. Vinick was a "responsible person" for purposes of 26 U.S.C. § 6672(a).  We said that the record contained sufficient evidence "from which one could infer Vinick's responsibility as a matter of fact."  Id. at 173.  We also noted, with regard to evidence limited to the periods during which the taxes were not paid, "[f]rom these indicia alone, one might infer that Vinick was a responsible person."  Id. at 172.  Yet now, after the trial judge has actually heard the same evidence, including testimony from Vinick that was contradicted in material respects by every other witness, the majority concludes that the trial judge erred in determining that Vinick was a responsible person. That alone is both passingly odd and at odds with the law of the case doctrine.

B.  Standard of Review

The majority empowers itself to reverse the district court by treating the question of whether Vinick is a "responsible person" as a question of law.  But the standard of

review utilized by this court in § 6672 cases is review for clear error. The majority says it is entitled to decide the question de novo because the district court committed an error of law. That error of law, according to the majority, is that the district court "considered Vinick's conduct over the entire period he was involved with Jefferson Bronze rather than his activities during the quarters in question." There was no error of law, as it was well within the district court's discretion to admit this evidence and determine what weight to give it. There is no reason to think the district court gave undue weight to this evidence. Also, Vinick may not be heard to complain on these grounds as he introduced much of the evidence in question and did not object to the evidence the government introduced, and so has waived this argument. Finally, there was no error, much less clear error, in the district court's factual determinations.

It is settled law in this circuit that a trier of fact's determination of whether a taxpayer had sufficient control over a corporation to be deemed a responsible person is subject to clear error review. In Caterino v. United States, 794 F.2d 1 (1st Cir. 1986), we said,

> This court cannot reverse merely because it is convinced that it would have decided the question differently; we must ascertain whether the finding of fact is clearly erroneous. We must affirm if the finding is reasonably supported by the record as a

> whole.  We must reverse when a review of the
> entire evidence leaves this court with the
> definite and firm conviction that a mistake
> has been committed.

Id. at 5 (internal quotation marks and citations omitted); accord Harrington v. United States, 504 F.2d 1306, 1313 (1st Cir. 1974) (affirming jury finding of responsibility "[s]ince the jury could properly have found that [the taxpayer] was the person with responsibility for the taxes").  We have viewed this as a fact dominated determination and so give deference to the trial judge.  See Caterino, 794 F.2d at 6 ("We conclude that the district court's finding that Caterino had sufficient power . . . to control what creditors [the corporation] would pay is not clearly erroneous.  Therefore, its conclusion that Caterino is 'responsible' within the meaning of section 6672 is not incorrect.").

The majority of circuits review the responsible person determination for clear error as well.  See Ghandour v. United States, No. 97-5062, 1997 WL 716143, at *1 (Fed. Cir. Nov. 17, 1997) (unpublished); United States v. Jones, 33 F.3d 1137, 1139 (9th Cir. 1994); United States v. Running, 7 F.3d 1293, 1297 (7th Cir. 1993); Raba v. United States, 977 F.2d 941, 943 (5th Cir. 1992); Donelan Phelps & Co. v. United States, 876 F.2d 1373, 1374 n.2 (8th Cir. 1989); Williams Indus. v. United States, No. 87-2630, 1988 WL 92869, at *1 (4th Cir. Sept. 6, 1988) (unpublished); Sinder v. United States, 655 F.2d 729, 731

-39-

(6th Cir. 1981).  Two circuits approach the issue differently.
See Bradshaw v. United States, 83 F.3d 1175, 1178 (10th Cir.
1995) (stating that determination of responsible person status
presents mixed question of law and fact, subject to de novo
review); United States v. McCombs, 30 F.3d 310, 319 (2d Cir.
1994) (reviewing findings regarding the taxpayer's role in the
company for clear error, but giving plenary review to conclusion
that taxpayer's role made her responsible under § 6672).  In
addition, the other circuits have correctly viewed this court's
standard of review as being the clearly erroneous standard.
See, e.g., Bradshaw, 83 F.3d at 1178 n.4; Running, 7 F.3d at
1297; Hochstein v. United States, 900 F.2d 543, 546 (2d Cir
1990).

          To support its departure from clear error review, the
majority cites to a number of Supreme Court and First Circuit
cases for the unremarkable proposition that a reviewing court is
not bound by the clearly erroneous standard where the trial
court has committed an error of law.  In the two Supreme Court
cases and the First Circuit case cited by the majority in which
there was departure from the clear error standard of review, the
trial courts had committed obvious and important errors of law.
In United States v. Parke, Davis, & Co., 362 U.S. 29, 43-44
(1960), the trial court had erroneously found that the lack of

an express or implied agreement to suppress competition precluded finding a violation of the Sherman Act. In United States v. Singer Manufacturing Co., 374 U.S. 174, 193-95 (1963), the trial court similarly misunderstood the nature of what would suffice to constitute a violation of the Sherman Act. In Brown Daltas & Associates, Inc. v. General Accident Insurance Company of America, 48 F.3d 30, 37 (1st Cir. 1995), the trial court had an erroneous view of which party bore the burden of proving a material element in the case.[1]

The majority opinion is simply wrong when it says that there was legal error on the part of the district court in this case. The record demonstrates that the district court understood both the nature of the inquiry into responsibility under § 6672 and the factors that were relevant to this inquiry.[2]

---

[1]Furthermore, Brown Daltas does not state that a reviewing court should apply de novo review when a trial court's factual finding has been affected by legal error. The language is more modest, noting that in this situation a "reviewing court is not bound by the clearly erroneous standard" and that the trial court's findings should be "accorded diminished respect on appeal." Brown Daltas, 48 F.3d at 36 (internal quotation marks and citation omitted).

[2]The majority's departure from the clear error standard will cause problems in a related area: the taxpayer's right to a jury trial. Is the majority contending that a jury must be instructed it cannot consider any evidence from outside the period in question?
While the First Circuit has not specifically ruled on the question of whether the Seventh Amendment right to a jury trial obtains in proceedings in which the government seeks to recover unpaid taxes, cases have routinely come to us after jury

-41-

C. <u>Standards Guiding the Determination</u>

The majority opinion is based upon errors of law both as to the rules it states and as to the application of otherwise correct rules. The majority thrice errs. First, the majority opinion creates a new and erroneous legal rule: that evidence from tax quarters outside of the quarters at issue may not be considered. There is no support given for this new rule, and it is contrary to the law. Second, the majority opinion pays lip service to the rule that the burden of proof is on the taxpayer and then ignores that principle. Third, the majority departs from circuit precedent by moving from a flexible, multi-factored approach to a single focus of decisive weight. Instead of regarding the individual factors as elements contributing to an overall picture of Vinick's status, the majority opinion notes for each factor that weighs in favor of responsibility that such an individual factor, alone, is insufficient to create

_____

determinations of whether a party is a responsible person. Both <u>Thomsen</u> v. <u>United States</u>, 887 F.2d 12, 13 (1st Cir. 1989) (involving a § 6672 action), and <u>Harrington</u> involved appeals from jury trials. We have applied clear error review to the responsible person determination in both bench and jury trials.

Other circuits have addressed the question and have found that the Seventh Amendment right to a jury trial does exist in this situation. <u>See</u> <u>United States</u> v. <u>McMahan</u>, 569 F.2d 889, 892 (5th Cir. 1978) (holding right to jury trial exists in § 6672 recovery suit brought by government); <u>cf.</u> <u>Damsky</u> v. <u>Zavatt</u>, 289 F.2d 46, 51 (2d Cir. 1961) (holding, in part, that right to jury trial exists in action by government to recover federal income taxes).

responsibility. But factors do not stand alone, and the district court correctly considered them in aggregate.

1. <u>Consideration of Evidence from Outside the Tax Quarters at Issue</u>

The district court properly considered evidence from outside of the quarters at issue so that it could determine Vinick's status, authority, and control during the pertinent quarters. No court, to my knowledge, has ever before held that it is error for a trier of fact to admit evidence from quarters other than the quarters during which the taxes were not paid and then to consider what weight to give to this evidence.

The district court acted in accord with the Federal Rules of Evidence in admitting evidence that has a tendency to prove or disprove a material fact (and thus is relevant). <u>See</u> Fed. R. Evid. 401-402. Courts regularly admit evidence of prior or later transactions, occurrences, and statements to prove material elements of cases. In corporate veil-piercing cases, which are analogous to the present case, courts consider evidence from outside of the period at issue to determine whether the principal should be held personally liable to the corporation's creditors. In <u>Crane</u> v. <u>Green & Freedman Baking Co.</u>, 134 F.3d 17 (1st Cir. 1998), a union benefits plan sought to pierce the veil of a corporation to recover unpaid sums from the corporation's principals. In reversing summary judgment for

the defendants, this court found "[p]articularly flagrant . . . the evidence of a personal vacation that the [principals] financed with corporate funds." Id. at 24. The court weighed the evidence of this vacation, which took place in January 1991, against the principals, even though the corporation failed to make payments to the benefits plan more than a year later, in April 1992. See id. at 20, 24. The court also considered evidence of checks from the corporate account that were made to the defendants beginning in January 1991. See id. at 24. Similarly, in Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 16 (1st Cir. 1985) -- another veil piercing case -- this court held that summaries of corporate checks made to the defendants were admissible as proof of the lack of separate corporate and individual identities even though the checks were made after the debt sued upon had been incurred.

Courts consider this type of temporally removed evidence in other situations as well. In fraud or misrepresentation cases, "proof that the defendant perpetrated similar deceptions frequently is received in evidence." 1 McCormick on Evidence § 197, at 695 (John W. Strong ed., 5th ed. 1999); see, e.g., Whittaker Corp. v. Execuair Corp., 736 F.2d 1341, 1347 (9th Cir. 1984). Also, "when the authority of an agent is in question, other similar transactions that the agent has carried out on behalf of the principal are freely admitted."

-44-

1 McCormick on Evidence § 198, at 698; see also 2 Wigmore on Evidence § 377, at 392-93 (James H. Chadbourn rev. 1979).

In the context of prosecutions for conspiracy to deceive immigration authorities through phony marriage ceremonies, the Supreme Court has held that evidence from the period after the conspiracy has ended is admissible to prove the spuriousness of the marriage and the intent of the parties. See Lutwak v. United States, 344 U.S. 604, 617 (1953). This court has allowed admission of post-conspiracy evidence in a criminal conspiracy case to prove the existence of the conspiracy and the defendant's participation. See United States v. Fields, 871 F.2d 188, 197 (1st Cir. 1989).[3]

Finally, in torts cases, evidence from before or after an accident has occurred is admissible for a number of purposes. See, e.g., Espeaignnette v. Gene Tierney Co., 43 F.3d 1, 5-10 (1st Cir. 1994) (holding that district court abused its

_____

[3]Similarly, Federal Rule of Evidence 404(b) specifically enumerates a list of purposes for which evidence of other "crimes, wrongs, or acts" is admissible. See, e.g., United States v. Tse, 135 F.3d 200, 208 & n.6 (1st Cir. 1998) (holding that evidence of a subsequent crime was admissible to show that defendant was "constantly trying to maintain his dominance" as leader of a gang); United States v. Fulmer, 108 F.3d 1486, 1501-02 (1st Cir. 1997) (holding that statements by defendant made prior to conduct for which he was charged was admissible to prove motive and intent); United States v. Spinosa, 982 F.2d 620, 628-29 (1st Cir. 1992) (holding that evidence of prior possession of cocaine was admissible to prove knowledge and intent); see generally 2 Weinstein's Federal Evidence § 404.20 (Joseph M. McLaughlin ed., 2d ed. 1999).

discretion in refusing to admit evidence of modification of saw to prove feasibility in design defect case and holding that evidence of lack of prior accidents was properly admitted to prove absence of defect and lack of causation); Clausen v. Sea-3, Inc., 21 F.3d 1181, 1189-92 (1st Cir. 1994) (holding that it was not plain error for district court to admit evidence of remedial measure taken three years after accident to prove defendant's control over area in which accident occurred).

In this case, Vinick's exercise of authority outside of the quarters in question sheds light upon the authority he had during the quarters in question. That he helped negotiate refinancing before the quarters in question suggests that he would have done so during the quarters in question. That he previously took steps to remedy the company's non-payment of taxes is also relevant to his authority and control during the pertinent quarters, as is the fact that he helped take the company into and through bankruptcy proceedings. Such evidence is relevant and, therefore, admissible. The trial court correctly concluded that it could admit, in this bench trial, evidence from outside the quarters in question, appropriately adjusting the weight such evidence would be given. There was no error.

Evidence from outside of the quarters in question serves an especially important role where, as here, taxes were

not paid for a relatively short period.  It could easily be the case that a person with significant authority and control in a company has no occasion to exercise that authority and control during a short period -- for example, when no major decisions need to be made and no significant events occur.  Although this may be purely a matter of luck, the majority opinion renders it potentially impossible in this type of situation to find that a person who actually has the authority to pay the taxes is a responsible person.

Further, Vinick has waived the issue of the district court's consideration of evidence from outside the quarters in question.  Where an appropriate, contemporaneous objection has been made, this court reviews admissions of evidence for abuse of discretion.  See Varano v. Jabar, 197 F.3d 1, 4 (1st Cir. 1999).  While Vinick made a motion in limine requesting that the government's evidence be limited "to the periods at Issue in the case at Bar," it was Vinick who introduced much of the evidence from outside of the quarters in question and thus waived the objection.  See Gill v. Thomas, 83 F.3d 537, 541 (1st Cir. 1996).  Moreover, Vinick never objected to the government's introduction of such evidence.  Therefore, review of the district courts evidence determinations is for plain error.  See Varano, 197 F.3d at 4; Clausen, 21 F.3d at 1190.

Vinick testified on direct examination regarding his involvement in hiring Ron Ouellette, signing Heritage Bank checks, the initial $165,000 financing, the $300,000 refinancing, and Jefferson Bronze's bankruptcy. Vinick also introduced evidence of Jefferson Bronze checks from before the quarters in question -- checks that lacked his signature -- to prove that he never exercised his check signing authority before the bankruptcy. On cross-examination, Vinick was questioned without objection regarding his negotiating a payment plan with the IRS during Ouellette's tenure. Vinick called two employees from Heritage Bank as witnesses and questioned them about the checks he had signed after the quarters in question. Vinick made no objection to the government's questioning of Elliot Rothwell, a National Grand Bank employee, regarding Vinick's involvement in the $300,000 refinancing. Vinick made no objection to the government's questioning of Ouellette regarding the frequency and amount of information Vinick received about Jefferson Bronze during Ouellette's tenure. Vinick made no objection to the government's questioning of Richard Letterman as to Vinick's role in the original $165,000 financing and in the $300,000 refinancing. Vinick made no objection to the government's questioning of Letterman regarding Vinick's role in

negotiating with the IRS during Ouellette's tenure, Vinick's involvement in hiring and firing decisions, and Vinick's involvement in the company's bankruptcy. Nor did Vinick object to the questioning of Letterman's wife regarding the frequency and amount of information Vinick received during her husband's tenure and the number of Heritage Bank checks Vinick signed.

It was not an abuse of discretion, much less plain error, for the district court to admit this evidence, which clearly had a tendency to prove Vinick's authority and control.

2. The Burden of Proof

As to the burden of proof, these cases usually involve a company that has withheld taxes from employees' wages and has then failed to pay the taxes to the government. In the meantime, the company has typically used the withheld funds to pay other creditors. Because the employees are held harmless and credited with the amounts withheld, the U.S. taxpayer often makes up the difference. In order to deter this behavior and lessen the costs imposed on other taxpayers, Congress has imposed a duty on persons whom the law deems responsible to collect, account for, and pay the taxes. Thus, the question is not who in the company ordinarily pays the taxes, but upon whom the law imposes a duty to see that the taxes are paid.

In keeping with the social policy objectives of § 6672, the burden of proof is on a taxpayer whom the IRS believes is a responsible person to prove that he is not a responsible person. See Caterino, 794 F.2d at 5. We have said that this may be a harsh rule, see id., but it is designed to protect the government and our nation's taxpayers from tax scofflaws, see Harrington, 504 F.2d at 1311. The district court, not the majority, has it right. Under the relevant tests, Vinick did not carry his burden of proof to show that he was not a responsible person.[4]

## 3. The Responsible Person Factors Should be Viewed in Aggregate

In keeping with the social policy objectives, "[c]ourts have explicitly given the word 'responsible' a broad interpretation." Caterino, 794 F.2d at 5. Since the term "responsible" is far from self-defining, we have generally looked to indicia of responsibility such as "the holding of corporate office, control over financial affairs, the authority to disburse corporate funds, stock ownership, and the ability to hire and fire employees." Thomsen v. United States, 887 F.2d 12, 16 (1st Cir. 1989). This was the standard the district court applied, and correctly so.

---

[4]The majority opinion even suggests that it viewed the burden of proof as the government's, stating that "the government introduced no evidence indicating that during the relevant quarters, Vinick had any involvement in the day-to-day operations."

Until now, this court has never suggested that the factors fell into an exclusive trinity or that the factor of day-to-day decision-making authority over company operations was the dispositive factor. The majority's suggestion that control over the company's day-to-day affairs is central to the responsible person determination conflicts with circuit precedent. In Harrington, this court held there was "no error in the court's charge [to the jury] that an individual need not be in day to day control of the administrative and financial aspects of the business in order to be [a] responsible person within the meaning of Section 6672." Harrington, 504 F.2d at 1315.

The majority opinion also skews normal appellate review, dismissing each factor pertaining to responsible person status by saying that that factor alone cannot support a responsible person determination. For example, the majority opinion states: "titular authority is insufficient," "not all shareholders are responsible persons," "occasional involvement in business affairs is insufficient," "[p]ossession of [check signing] authority . . . is not enough." But factors in combination can describe sufficient authority or control to render someone a responsible person.

D. Record Support for the Determination

This case comes to us after trial, and we are required to draw all inferences from the evidence in favor of upholding the verdict. See United States v. Ven-Fuel, Inc., 758 F.2d 741, 744-45 (1st Cir. 1985). Although the majority opinion recognizes this principle, it does not follow it; it could not do so and reach the result it does.

This picture emerges from the evidence: Vinick owned half the company and was one of its incorporators. He was, throughout, its treasurer and one of only two directors. During the periods in question, there were only two corporate officers, Vinick and Letterman. When Letterman, Vinick, and Peter Mayer bought the company in 1981, Vinick agreed, both personally and in his capacity as treasurer, to reimburse the former owner for any taxes owed. Vinick signed the note and pledged his house as security for the original financing of $165,000 with the Small Business Administration ("SBA"). This gave him a strong incentive to stay involved in what the company was doing, and Vinick did keep abreast of the company's financial situation. He prepared all of the tax returns, including returns when the company lacked funds to pay the taxes. In order to prepare the taxes, he was given regular information about income and expenses. Indeed, throughout his relationship with the company he received more information than that. He was regularly given copies of the check registers and reviewed information on a

-52-

weekly basis from those actually operating the company.  His
activities went beyond those of a mere accountant.[5]

Although the district court did not decide the issue,
Vinick appears to have played a significant role in hiring and
firing.  In 1983, after the SBA complained to Vinick about
Mayer, the first operations manager, Vinick and Letterman
decided to remove Mayer.  Vinick then asked Ouellette to run the
company.  In 1988, when Ouellette had problems, Letterman moved
into the position, doing so with Vinick's tacit approval.

In 1985, when the company could not pay its withholding
taxes, Vinick and Letterman (but not Ouellette, the company's
day-to-day manager) went to see the IRS, and Vinick worked out
a settlement agreement and payment schedule that Ouellette
followed.  This effort belies the majority opinion's suggestion
that Vinick was merely a passive investor.  The fact that Vinick
did not keep the checkbook or write the checks did not stop him
from exercising his authority to correct this problem with the
IRS, and there is nothing to indicate that, having exercised
this authority in 1985, he did not have such authority in 1989
and 1990.

Throughout, Vinick had check-signing authority.  He
chose not to exercise any such authority until the company went

---

[5]Vinick denied he acted as the company's accountant; this
was contradicted by other witnesses.

into bankruptcy in mid-1990. If he had regularly signed checks, the IRS would have had a stronger case. But that he chose not to sign checks until later does not negate his authority to do so during the quarters in question. Indeed, when he did exercise check-signing authority during the bankruptcy period, he even went to the bank to complain that it was letting checks go through without his signature on them.

The quarters when the taxes were not paid were the last three quarters of 1989 and the first two quarters of 1990. The majority opinion asserts that there was a sea change in the operations of the company during those quarters. That is not so. It is true that Letterman took control of day-to-day operations of the company in 1988, and his wife acted as the bookkeeper. It is also true that Vinick then reduced his involvement in the day-to-day operations. But it is not true that he reduced his involvement in the financial affairs of the company.

The majority opinion is simply incorrect when it states that "the record is undisputed that Vinick became less involved in the financial affairs of the corporation as Letterman's role increased." When Ouellette ran the day-to-day operations, Vinick discussed the company's financial condition with him "on a _monthly_ basis." In contrast, when Letterman ran the day-to-day operations, Vinick reviewed the company's financial

condition <u>at least weekly</u>, and often more frequently.  Letterman testified that he and Vinick had weekly conversations about how the company was doing, that Vinick saw the weekly receipts from customers, and that Mrs. Letterman "brought him everything [they] did."  Mrs. Letterman testified that she brought Vinick the company's income and expense information at least weekly, and more frequently at the end of the month.  The judge was entitled to accept the Lettermans' testimony over Vinick's contradictory testimony that he got such information at most once a month.  In fact, Richard Letterman testified that Vinick was privy to all information about what was happening at all times.  Nor did Vinick's other financial activities lessen. Just as before, Vinick prepared the tax returns and the profit and loss statements.  Just as before, he refused to sign the returns and told others to do so.

When there were major decisions to be made, Vinick made them together with Letterman.  The two of them decided in mid-July of 1990 that the company had to be put into bankruptcy. Vinick went to the bankruptcy court, and he started signing company checks that he had always had the authority to sign.  At trial, Vinick attempted to minimize his role in the running of the company at this stage, but his testimony was contradicted by others.  For example, Vinick claimed he signed the vast majority of checks only after they had been negotiated with only

Letterman's signature. Two bank officials and Letterman's wife all said he signed most checks before negotiation.

But it is what happened during and around the quarters in question that reinforces that the district court's conclusion was not error. The district court quite properly weighed in Vinick's favor the fact that he did not run the company day-to-day. But it is also true that when the company ran into financial problems, Vinick played a considerable role. In May of 1988, the company secured a $300,000 loan from National Grand Bank, refinancing its earlier $165,000 loan and obtaining additional operating capital. Vinick and Letterman met with Eliot Rothwell, a bank official, two or three times to secure the loan. Rothwell found Vinick to be familiar with the company's financial condition. Vinick signed the loan application and then signed the note both in his individual and corporate capacities. Vinick and Letterman each personally guaranteed the loan, and there is evidence that each pledged his home. The bank encouraged them to open an account there for the company; Vinick and Letterman were the signatories. Vinick said there was a separate $300,000 loan from Bank of New England that was made personally to him and to Letterman, that the money was put into the company, and that he gave a mortgage on his home for this loan. In any event, if the obligations to National Grand Bank were not met, Vinick was personally in jeopardy. In

fact, Vinick's interest in being involved in the company's financial affairs had now become even greater than it was originally, as the amount for which he was personally liable had almost doubled. This helps explain his weekly review of the company's finances during Letterman's tenure.

In early 1989, just before it stopped paying its taxes, the company became delinquent on the National Grand Bank loan. Vinick and Letterman then met several times with Rothwell to try to work out the problem. Again, Rothwell found Vinick knowledgeable about the company's financial affairs. Vinick was well aware during this period that the company was not paying the taxes withheld from employees. Vinick did not do what he had done in 1985, which was to try to work out matters with the IRS and negotiate a plan to pay the taxes owed. In essence, it is fair to infer that he and Letterman together decided to treat the IRS as a second-best creditor and put their efforts and the company's payments toward the bank, to which they had immediate personal liability. But that is not what the law permits. See Donelan Phelps, 876 F.2d at 1377. The record amply supports a finding that Vinick was a responsible person.

This is not a case, as the majority would have it, of a passive investor unfairly being saddled with § 6672 liability. Such investors do need protection, a fact that was amply demonstrated by the government's aggressive and overreaching

-57-

posture at oral argument.  The evidence in this case, however, showed that Vinick was not merely a passive investor.  On the evidence presented, Vinick could have been, and was, deemed a responsible person.  As such he had a duty to ensure that the taxes were paid.  Given the degree of his involvement and control over financial and other matters in the company, Vinick could not avoid that duty by refusing to write checks to the IRS that he had the authority to write, by refusing to sign tax returns that he had the authority to sign, and by failing to meet with the IRS when he had the authority to do so.

E. Disposition on Appeal

Even if the majority opinion were correct in asserting that the district court had a mistaken impression of applicable legal principles, then the proper disposition would be to remand the case to the district court, not to decide the case ourselves.  Where the evidence "does not compel a ruling for either side," the proper course is to remand the case to the trial court.  TEC Eng. Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir. 1996).  It cannot be said that the record compels a finding that Vinick was not a responsible person.

But for his dissembling at trial, there is a temptation to feel sorry for Vinick.  His investment in this small company has led to a nightmare for him.  Yet, it was not his investment

alone that led to his being a responsible person, nor was it merely his title as treasurer.  Crediting the entire record, there was no error in the trial judge's decision, and I dissent.