**Diane M. KEOHAN, Plaintiff and Counterclaim Defendant,**

v.

**UNITED STATES of America, Defendant and Counterclaim Plaintiff.**

**Civil Action No. 98–10859–RBC [1].**

United States District Court, D. Massachusetts.

March 19, 2001.

---

**1.** With the parties' consent, this case was referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

Michael Magerer, Needham, MA, for Diane M. Keohan.

Wendy J. Kisch, Alex E. Sadler, U.S. Department of Justice, Tax Division, Washington, DC, Susan M. Poswistilo, United States Attorney's Office, Boston, MA, for United States of America.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO RULE 52, FEDERAL RULES OF CIVIL PROCEDURE

COLLINGS, Chief United States Magistrate Judge.

#### I. Introduction

This case involves the efforts of the United States, Department of the Treasury, Internal Revenue Service (hereinafter "IRS") to collect employee payroll taxes that a masonry contracting business failed to pay to the IRS. During the period under review, the last quarter of 1992 and all of 1993, Keohan Masonry (hereinafter "Keohan Masonry" or "the Business") was a sole proprietorship founded and operated by Timothy Keohan (hereinafter "Keohan").[2] Keohan's wife, Plaintiff Diane M. Keohan (hereinafter "Plaintiff"), was an employee of the Business who worked on a flexible, though full-time, schedule, and was paid an annual salary. Not unexpectedly, neither the Business nor Keohan had the funds to pay the IRS what it was owed when the IRS reminded Keohan of his obligation. The IRS then sought to discover if anyone else in the Business may be responsible for the tax liability.

The IRS discovered the scope of Plaintiff's involvement in the Business, determined that such involvement imposed upon her an obligation to ensure that the taxes were paid, and issued an Assessment against her on June 6, 1996, for the sum of $70,242.92, pursuant to Section 6672 of the Internal Revenue Code. 26 U.S.C. § 6672.

---

2. Prior to the last quarter of 1992, the testimony indicates that Keohan Masonry existed as a corporation, but had since been dissolved. Tr. at

Although Plaintiff acknowledges that she knew the Business owed the taxes that were supposed to have been held in trust, and knew that other creditors of the business were being paid instead of the IRS at the time the taxes were due, Plaintiff challenges the IRS's finding that her role in the Business was significant enough to make her responsible to ensure that the taxes were paid in the first instance.

Plaintiff asserts that her husband ran every aspect of Keohan Masonry's operations. (Tr.[3] at 36). With respect to the Business's financial affairs, Plaintiff testified that her husband "did all of the financial work for Keohan Masonry" and was singularly responsible for ensuring that all withholding taxes were paid over to the government. (Tr. at 38–39, 79–80). Plaintiff claimed further that she had no fixed duties and responsibilities within Keohan Masonry. (Tr. at 34–35). Rather, she described her role in the Business as having been limited to running occasional errands and performing miscellaneous administrative tasks only when requested by her husband, and only when her business responsibilities did not conflict with her care of their three, young children. (Tr. at 34–36, 39, 47–48). Plaintiff disputed at trial that she was even an employee of Keohan Masonry. (Exhs. D–1 and D–2; Tr. at 91–92, 200). Plaintiff testified that, although she signed many checks, she never exercised independent judgment in signing those checks, and disbursed funds out of Keohan Masonry's payroll and operating accounts only when Keohan had specifically directed her to do so. (Tr. at 45–46, 49, 56–57, 71–74, 134–35, 137). In essence, Plaintiff offers to prove that she was only "there" in form and not substance, only did what her husband told her to do regarding the Business's affairs, provided minimal substantive impact on the affairs of the Business, and that she had no influence on the affairs of the Business regarding who, whether employees or creditors, got paid when or how much. Based upon the totality of the circumstances, however, the court does not credit Plaintiff's testimony to the effect that her role was so limited, and, pursuant to the applicable legal principles, the findings of fact, and the conclusions of law more particularly set forth below, the court holds Plaintiff liable to pay the IRS Assessment.

## II. Findings of Fact

### A. Keohan Masonry

1. During the last quarter of 1992 and the four quarters of 1993, which are the quarters under review, Keohan Masonry was a sole proprietorship owned by Plaintiff's husband, Keohan. The Business was involved in doing block and brick work on retail construction projects. (Stipulation[4] at ¶ 2(h) and (i); Tr. at 34, 170, 196).

2. Keohan Masonry's business office was located in the Keohans' home in Topsfield, Massachusetts. (Stipulation at ¶ 2(j); Tr. at 35).

3. It was undisputed, and the court so finds, that Keohan primarily managed the day-to-day masonry operations of the Business. (Tr. 196–98).

---

**3.** Citations to "Tr." refer to the transcript for the first day of trial, September 30, 1999. No evidence was received on the second trial day, October 1, 1999. Any reference to the transcript from the arguments and representations made on October 1, 1999, shall be indicated by Tr.(2nd Day).

**4.** Prior to trial, the parties submitted a Joint Pre–Trial Memorandum (# 24), in which were identified twelve sub-paragraphs, 2(a)-(1), of "[f]acts established by the pleadings or by stipulations." On the first day of trial, the court accepted these "stipulations" into evidence for consideration as "stipulations of fact" (hereinafter "Stipulation at ¶___"). (Tr. at 5).

4. The Business performed masonry jobs throughout Massachusetts and neighboring states, requiring Keohan and his work crews to travel frequently. (Stipulation at ¶ 2(i); Tr. at 196–98). Regardless of whether a job was within commuting distance or required extended overnight travel, Keohan worked primarily at the job site. (Tr. at 197).

5. The Business paid its employees on a weekly basis. (Tr. at 93). During the quarters at issue, the Business withheld between $187.17 and $3,206.86 in federal income and social security taxes from its employees' wages each week. (Exh. D–10; Tr. 93).

6. During almost the entire five-quarter period under review, neither the Business nor Keohan timely remitted the withheld trust fund taxes to the IRS.[5] (Stipulation at ¶ 2(e); Tr. (2nd Day) at 11 ).

7. Specifically, from October 1, 1992 through December 31, 1993, the Business failed to pay over to the United States $70,242.92 that it had withheld from its employees' wages. (Exh. D–17).

8. The Business utilized the services of an outside accountant to assist in the preparation and filing of its tax returns. (Tr. at 37 and 187; *see also* note 5, *supra* ). The outside accountant was hired exclusively by, and communicated solely with, Keohan.

9. It was undisputed, and the court so finds, that Plaintiff was not involved directly in the collection or payment of the Business's taxes.

10. During the quarters at issue, the Business experienced cash flow problems and fell behind in paying certain creditors. (Stipulation at ¶ 2(k)).

11. During the period under review, the Business did pay wages to its employees and expenses owed to certain creditors, as well as various expenses of the Keohan family wholly unrelated to the Business. (Exh. D–9).

12. Monthly bank statements show that $342,674.59 flowed through the Business's payroll account from September 22, 1992, through December 20, 1993. (Exhs. D–7, D–8; Tr. at 93–94).

13. In addition, during the tax quarters at issue Plaintiff signed company checks designated for operating expenses, other than for payroll expenses, in varying amounts totaling $116,375.39. (Exhs. D–5 and D–6).

14. Thus, the court finds that funds were available during the period under review that could have been used to pay the Business's delinquent withholding tax obligations, but were used instead to pay the other creditors of the Business and personal expenses.

## B. *Plaintiff's Role in Keohan Masonry*

### a. *Financial Interest in the Business*

15. During the tax quarters at issue, Plaintiff was the only salaried employee of Keohan Masonry. (Exhs. D–1 and D–2; Tr. at 100–103 and 189–91). All other employees were paid hourly wages. (Tr. at 100).

16. In 1992, Plaintiff received a salary of $48,100 from Keohan Masonry. Her

---

**5.** According to Keohan Masonry's weekly payroll reports (Exh. D–9), Keohan Masonry arranged for its payroll service provider to "impound" funds from its payroll account to pay federal and state employment taxes and to pay those funds over to the IRS and state of Massachusetts for the pay periods from May 31, 1993, to August 14, 1993. (Tr.( 2nd Day) at 11). There is no evidence in the record that Keohan Masonry made arrangements to pay the withholding taxes for any other pay periods.

salary was nearly twice as much as the wages paid to the next highest paid employee who earned $26,473.25. (Exh. D–2; Tr. at 101).

17. In 1993, Plaintiff received a salary of $63,900. (Exh. D–1; Tr. at 105). As in the previous year, her salary was substantially greater than the wages paid to the next highest paid employee who earned $32,226.16. (Exh. D–1; Tr. at 104, 189–91).

18. Keohan did not receive a salary or any other form of monetary compensation from the business during the tax quarters at issue. (Exhs. D–1 and D–2; Tr. at 101–04; 189–90).

19. Plaintiff agreed to the above-described salary arrangement. (Tr. at 108–109).

20. In addition to her salary, Plaintiff was allowed the discretion to, and did indeed, withdraw funds for personal and household expenses. (Exhs. D–5 and D–6; Tr. at 80–81, 105).

21. For the period under review, Plaintiff drafted and signed checks that withdrew from the Business checking accounts at least $ 9,686.14 for her and her family's personal use. (Exhs. D–5 and D–6; Tr. at 123, 126–132).

22. At one point during 1993, Plaintiff signed a check transferring $20,000.00 to a savings account. (Exh. D–5, p. 301; Tr. at 113–14).

23. Plaintiff knew that the IRS was not being paid the withheld payroll taxes at the time she signed checks from the Business's payroll account so that she and the other employees would continue to receive their full paychecks. (Stipulation at ¶ 2(1)).

24. Plaintiff's and Keohan's testimony suggests that the reason for Plaintiff's large salary was to either protect funds from the collection of past-due taxes owed by Keohan to government agencies or to increase Plaintiff's ability to qualify for various loans from one or more business entities. (Tr. at 81 and 209). I do not find the testimony on this point sufficiently credible to make a finding that either or both of these asserted reasons are the true reason(s) for the arrangement.

25. Plaintiff has not shown by a preponderance of the evidence that she had an insignificant financial interest in the Business. Rather, the court finds that Defendant has shown by a preponderance of the evidence that Plaintiff had a significant financial interest in the Business which she knew would have been adversely affected if the IRS had been paid in a timely manner the withheld payroll taxes supposedly held in trust for the IRS.

### b. Participation in Day–to–Day Affairs of the Business

26. The parties agree, and a preponderance of the evidence indicates, that Plaintiff did not participate in the Business's day-to-day masonry operations. (Tr. at 41–44, 53–55).

### c. Participation in Financial Affairs of Business

### i. Authority To Disburse Funds.

27. Plaintiff worked approximately 40 hours per week performing such tasks as preparing project bids based on information Keohan provided to her, acting as the payroll manager for the purpose of signing and delivering checks, "go[ing] over the bills, se[ing] what was late and, you know [drafting checks to pay those bills]," filing, answering telephones (including collection calls), contacting suppliers at the direction of Keohan and upon her own discovery of overdue bills. (Tr. at 110 and 199).

28. The Business maintained two checking accounts, one for payroll and the other for operating expenses. Both Keohan and Plaintiff had bank authorization to sign checks independently on each account. (Exhs. D–3 and D–5; Tr. at 60 and 200–01).

29. Plaintiff was made a signatory on the Business's checking accounts primarily so that she could sign paychecks and pay other bills when Keohan was working at a job site. (Tr. at 182, 196–98, and 200).

30. Plaintiff could issue checks for both of the Business's checking accounts without obtaining Keohan's co-signature. In addition, there were no bank restrictions on the amount of the checks that Plaintiff could sign. (Tr. at 111–12).

31. Plaintiff testified that she could have independently issued a check if "it was something that was really, really important or an emergency type of thing." (Tr. at 56–57). Similarly, Keohan testified that Plaintiff was authorized to sign checks without his approval "if it was an emergency," such as to prevent their phone from being cut off by the phone company. (Tr. at 201–02). Keohan acknowledged also that "if there was money in there [the Business's bank accounts], she could write the check for the money that was in there." (Tr. at 202).

32. In light of these last two evidentiary findings and the fact that the IRS was not paid during the period in question, the court finds that Plaintiff decided that the payment of the Business's mounting withholding tax delinquencies were neither "really, really important" nor constituted an "emergency."

33. Keohan's deposition testimony that the United States introduced both for impeachment purposes and as substantive evidence, as well as his trial testimony, credibly indicates that Plaintiff possessed and exercised the authority to pay non-substantial bills and personal expenses, which he defined as bills under $1,000, without obtaining his permission. (Tr. at 202–207 and 215–17). As an example, he testified that Plaintiff had authority to pay a $220 phone bill without first checking with him. (Tr. at 204).

34. With respect to the payroll account, Plaintiff testified that each week either she or her husband called in employees' hours to Keohan Masonry's payroll service provider. (Tr. at 94–95). The payroll service provider then delivered a package of pre-printed paychecks to Plaintiff's attention with instructions that the package should be opened "by payroll manager only." (Exh. D–11; Tr. at 95). On most occasions, Plaintiff opened the package and signed the paychecks. (Tr. at 95–96).

35. Plaintiff acknowledged that she signed the "vast majority" of paychecks issued by Keohan Masonry during the tax quarters at issue. (Tr. at 97). Of those paychecks admitted into evidence, Plaintiff signed 453 checks in the total amount of $240,138.03. (Exhs. D–3 and D–4; Tr. at 97–99).

36. Of the 453 paychecks that Plaintiff signed on behalf of Keohan Masonry, 52—or roughly 1 out of every 9—were made payable to herself for approximately $1,000 each week as salary from the business. (Exhs. D–3 and D–4; Tr. at 99–100). The total dollar amount of the paychecks that Plaintiff signed payable to herself was $52,056.61. (Exh. D–4).

37. The court finds by a preponderance of the evidence that when Plaintiff signed her own paychecks each week with full knowledge that the Business was not paying its trust fund taxes over to the government that she made a choice to accept the salary from the Business rather than influencing the Business to pay its tax obligations to the United States.

38. Plaintiff issued also a substantial number of checks from Keohan Masonry's operating account during the tax quarters at issue. Of the operating account checks admitted into evidence, Plaintiff signed 124 checks in the total amount of $116,375.39. (Exhs. D–5 & D–6).

39. The majority of the checks that Plaintiff issued from Keohan Masonry's operating account were for amounts less than $1,000. (Exh. D–6; Tr. at 116–17).

40. Several of the checks that Plaintiff drew off the operating account were made payable to cash in amounts that ranged from $30 to $20,000. (Exhs. D–5 and D–6; Tr. at 119–23). Plaintiff used the cash that she withdrew from Keohan Masonry's operating account to pay employees and other creditors of Keohan Masonry, as well as to pay for various family expenses such as food, dental visits, furniture, and party supplies. (Exhs. D–5 and D–6; Tr. at 120–23).

41. Plaintiff also signed numerous checks from the operating account payable to suppliers and other creditors of Keohan Masonry, such as USF & G, the Business's workers' compensation insurer, and Lowell Builders Supply, a masonry material supplier. (Exhs. D–5 and D–6; Tr. at 124–26).

42. In addition to the checks payable to cash described above, Plaintiff wrote many checks on Keohan Masonry's operating account to pay for personal items and family-related expenses, including the following:

| Check Number | Payable To | Description | Amount |
|---|---|---|---|
| 3427 | The Lenders | mortgage on personal residence | $1,298.31 |
| 3546 | The Lenders | mortgage on personal residence | 1,298.31 |
| 3600 | Robert King | second mortgage on personal residence | 420.00 |
| 3687 | Robert King | second mortgage on personal residence | 210.00 |
| 3431 | Essex County Gas Co. | gas bill | 335.64 |
| 3679 | Essex County Gas Co. | gas bill | 827.53 |
| 3502 | Trinity Pre–School | registration fee | 35.00 |
| 3734 | Trinity Pre–School | tuition | 137.00 |
| 3545 | Continental Cable Co. | cable bill | 35.00 |
| 3750 | D & G Septic Tank | septic cleaning | 180.00 |
| 3680 | Peter Cabral Landscaping | lawn care | 35.00 |
| 3515 | Peter Cabral Landscaping | lawn care | 150.00 |
| 3677 | Cub Scout Pack 81 | registration fee | 21.40 |
| 3683 | Jordan's Furniture | household furniture | 580.00 |
| 3681 | Yield House | quilt | 177.45 |
| 3684 | James Krasco | plumbing | 160.00 |
| 3517 | Cuts & Such | haircut | 43.00 |
| 3478 | Melissa Tuscano | babysitting | 30.00 |
| 3638 | Nail Expression | nails | 25.00 |
| 3732 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |
| 3730 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |
| 3550 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |
| 3641 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |
| 3686 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |
| 3452 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |
| 3426 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |

| 3542 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |
| 3476 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |
| 3597 | Eastern Bank Installment Loans | car payment for Plaintiff's personal car | 331.25 |

(Exhs. D–5 and D–6; Tr. at 126–32).[6]

43. Of the more than 550 checks that Plaintiff drew off of Keohan Masonry's checking accounts during the five tax quarters at issue, only one—in the amount of $8.50 to purchase tax forms—was made payable to the IRS. (Exhs. D–5 and D–6; Tr. at 132–34).

44. Based on the foregoing, the Court finds by a preponderance of the evidence that during the tax quarters at issue Plaintiff exercised her authority over the Business's funds to issue numerous checks to pay herself and other creditors of the Business as well as an assortment of personal expenses. I do not credit her testimony that she only issued checks when she was specifically directed to or given permission to by Keohane.

45. The Court finds that Plaintiff neither exercised nor sought to exercise her authority or influence over the Business's funds to reduce the Business's escalating trust fund tax liabilities.

### ii. *Plaintiff Exercised Influence Over Which Creditors Would Be Paid.*

46. The parties stipulated that Plaintiff was aware that Keohan Masonry had become delinquent on its federal withholding tax liabilities during the tax quarters at issue. (Stipulation ¶ 2(1)).

47. Plaintiff's involvement in the Business's financial affairs was not limited to drawing a salary, assisting with payroll, and disbursing funds from the Business's bank accounts. In addition, Plaintiff testified that she contacted suppliers two to three times a week to order masonry materials for ongoing jobs and fielded several collection calls a week from creditors seeking payment of past due bills from the Business. (Tr. at 110).

48. One such creditor, Ted Cathcart, testified at trial. Mr. Cathcart is the owner of Lowell Builders Supply, a masonry material supplier located in Lowell, Massachusetts. (Tr. at 111, 153–54). Lowell Builders Supply provided masonry materials to the Business for use on both the Keohan's personal residence and on projects completed by the Business. (Tr. at 155).

49. In May 1992, Lowell Builders Supply ceased providing the Business with materials because of an $8,300 debt that had been outstanding for a significant amount of time. (Tr. at 159). Initially, Mr. Cathcart attempted to communicate directly with Keohan in order to collect the debt. (Tr. at 156–57). In December 1992, Mr. Cathcart focused his efforts to collect the debt on communicating with Plaintiff, primarily because Keohan was unavailable, despite Mr. Cathcart's best efforts. (Tr. at 159). Once Mr. Cathcart focused his debt collection efforts through Plaintiff, the Business started issuing checks to Lowell Builders Supply. (Tr. at 160).

50. Mr. Cathcart was a credible witness. He did not demonstrate animosity

---

**6.** On cross-examination, Plaintiff verified that most of these checks were for personal, as opposed to business, expenses. (Tr. at 126–32). The remaining checks included in this chart lack any apparent connection with the masonry business, and the Keohans supplied no such connection at trial.

toward the Keohans and had no financial interest in the outcome of this action.

51. Plaintiff's testimony was, in part, consistent with Mr. Cathcart's recollection of their conversations. Plaintiff testified that because she and Mr. Cathcart had a good rapport, after receiving a call from him, she would encourage her husband to have Keohan Masonry send a check to Lowell Builders Supply. (Tr. at 57–58).

52. Mr. Cathcart also testified that, after Keohan Masonry had reduced its outstanding account balance with Lowell Builders Supply to $3,000, Plaintiff contacted him and offered to pay $2,000 to settle Keohan Masonry's account. (Tr. at 163). Mr. Cathcart accepted the offer, and Plaintiff personally delivered the $2,000 check to Lowell Builders Supply. (Tr. at 163).

53. Plaintiff's testimony that she did not negotiate this settlement with Lowell Builders, and that the only person who would have participated in such a negotiation was Timothy Keohan, is not entirely credible, and ignores the influence that Plaintiff possessed regarding which bills were paid. (Tr. at 58–59). Ted Cathcart testified that he had no contact with Timothy Keohan, whatsoever, regarding the settlement. (Tr. at 163). Moreover, Plaintiff herself did not deny calling Mr. Cathcart and offering the $2,000, she simply did not recall the specifics of the transaction. (Tr. at 58).

54. After Mr. Cathcart spoke with Plaintiff, Lowell Builders Supply usually did receive a check from Keohan Masonry. (Tr. at 160–61). All but one of the checks that Lowell Builders Supply received after December 1992 were signed by Plaintiff. (Exhs D–5 and D–6; Tr. and 125–26, 161–62).

55. Based upon the totality of the circumstances surrounding Plaintiff's dealings with the Business creditors, including Lowell Builders Supply, and her independent authority with regard to the payment of personal expenses and creditors, *inter alia*, the court finds by a preponderance of the evidence that Plaintiff had significant power to influence the Business to pay debts owed to any creditor.

56. To the extent that any of the foregoing Findings of Fact constitute Conclusions of Law, they shall be so construed.

### III. Applicable Law

### A. Trust Fund Refund Taxes

■ Employers are required to withhold federal income and social security taxes from their employees' wages for each pay period. *See* 26 U.S.C. §§ 3102 and 3402. Employers are directed then to hold in trust the taxes collected for the United States, 26 U.S.C. § 7501, until the taxes are due, usually on a quarterly basis. *See generally* Code of Federal Regulations, Title 26, Part 31. In the event that an employer fails to pay the funds so held in trust, the IRS is authorized to pursue those individuals or entities related to the employer who were responsible for paying the taxes in question, and willfully failed to do so. *See* 26 U.S.C. § 6672; *see also Vinick v. Commissioner of Internal Revenue*, 110 F.3d 168, 169–70 (1 Cir., 1997) (hereinafter *"Vinick I"*); *Caterino v. United States*, 794 F.2d 1, 3 (1st Cir., 1986)(noting that the IRS "has no recourse against employees who have had income and social security taxes withheld from their wages.").

■ Since enacted in 1954, United States Code, Title 26, section 6672(a) provides, in pertinent part, that:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax by this title, or

willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. Section 6672(a) sets forth, therefore, a two-part analysis. The first, and threshold, determination that must be made concerns which person or entity is, on behalf of the employer, *"required* to collect, account for, and pay over any tax imposed." *Id.* (emphasis added). The second determination, which is reached only when someone is identified pursuant to the first inquiry, concerns whether that person *"willfully* fail[ed] to collect ..., truthfully account for[,] and pay over such tax, or attempt[ed] in any manner to evade or defeat any such tax or the payment thereof." *Id.* (emphasis added).

## B. *Responsible Person*

The term "responsible" has been attached to those persons or entities who fall within the parameters of the statute's first determination. *See Slodov v. United States,* 436 U.S. 238, 245–46 n. 7, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978)("us[ing] that phrase without necessarily adopting any of the constructions placed upon it in the decisions"); *Vinick v. United States,* 205 F.3d 1, 7 (1 Cir., 2000) (hereinafter "Vinick II"); *Caterino,* 794 F.2d at 3; *Harrington v. United States,* 504 F.2d 1306, 1312–13 (1st Cir.1974); *In re Aboody,* 250 B.R. 1 (B.C.D.Mass., 2000). The United States Supreme Court has explained the significance of the first determination's express statutory parameters:

> We conclude therefore that the phrase "[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title" was meant to limit § 6672 to persons responsible for collection of third-party taxes and not to limit

it to those persons in a position to perform all three of the enumerated duties with respect to the tax dollars in question.

*Slodov,* 436 U.S. at 250, 98 S.Ct. 1778 (footnote omitted).

[3] A responsible "person" includes "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is *under a duty* to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b)(emphasis added); *see, e.g., Caterino,* 794 F.2d at 3–4 (holding "responsible" non-officer employee of corporation who guaranteed loan to corporation, filed taxes on corporation's behalf, and influenced the hiring of general manager); *George v. United States,* 819 F.2d 1008, 1011 (11 Cir., 1987)(vice president, director, and 50% shareholder who was signatory on checking account, in possession of check, and could hire and fire employees, was found "responsible" even though he had almost no involvement in financial affairs of corporation); *Howard v. United States,* 711 F.2d 729, 734 (5 Cir., 1983)(corporate officer, operations manager, and minority shareholder with individual check-signing authority was "responsible person" even though president and CEO ordered him not to pay any taxes); *Price v. United States,* 93–1 USTC ¶ 50,-134, p. 87,494, 1992 WL 455527 (D.Minn., 1992)(genuine issue of fact existed as to "responsibility" of corporation president's wife, who held office of secretary, owned small amount of stock, signed various checks to creditors in amounts less than $700.00, and set up a separate company checking account in order to avoid levying by creditors, but who insisted that she had no control over marketing, operations, or finances of the corporation); *First American Bank and Trust Co. v. United States,* 79–1 USTC ¶ 9205, 1979 WL 1292

(W.D.Okla., 1979)(bank that exercised significant approval authority over which creditors would be paid and that supplied to business funds for payroll, creditors, and to pay the bank itself while knowing that taxes would not be paid held "responsible"). In addition, " 'delegation will not relieve one of responsibility; liability attaches to all those under the duty set forth in the statute.' " *Thomsen v. United States*, 887 F.2d 12, 17 (1 Cir., 1989) *quoting Harrington*, 504 F.2d at 1311 and *citing Braden v. United States*, 442 F.2d 342, 343 (6 Cir.), *cert. denied*, 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971)(existence of the same duty and concomitant responsibility in others does not relieve a party of responsibility). However, as cogently set forth in a Fifth Circuit opinion:

> Employees of a corporation are agents, and a corporation may deny to an agent the actual authority to pay taxes. Requiring an employee to pay over taxes when he does not have the actual authority to do so would be tantamount to requiring any employee with mere access to company funds to steal funds that the company owes the government. Section 6672 does not impose such a responsibility upon any corporate employee, but the law does impose a duty on the employees not to dissipate the trust by paying other creditors with money owed to the government.

*Gustin v. United States*, 876 F.2d 485, 492 (1989).

■ "Responsible persons" who "willfully" act or fail to act in accordance with the statute may be subject to civil penalties equal to 100% of the unpaid or uncollected taxes, 26 U.S.C. § 6672(a). Such persons also may be guilty of a felony, if charged within the applicable limitations period, and thereby subject to a fine of up to $10,000 or imprisonment for up to five years, or both. 26 U.S.C. § 7202. Once a civil assessment has been issued by the IRS pursuant to section 6672, the person challenging that assessment has the burden of proving by a preponderance of the evidence that he or she is not a "responsible person" or did not act "willfully." *Caterino*, 794 F.2d at 5 ("although the rule appears harsh, as in other tax litigation, a person who challenges a section 6672 assessment bears the burden of persuasion to prove lack of control"). The criminal statute and attendant burdens are not at issue in this case.

■ A "totality of the circumstances" analysis is used to determine if a particular person or entity is a "responsible person." *Vinick II*, 205 F.3d at 8 ("No single factor is determinative of responsibility"). Under this analysis, indicia of "responsibility" typically include whether the person under review:

1. Is an officer or member of the board of directors;

2. owns shares or possesses an entrepreneurial stake in the company;

3. is active in the management of day-to-day affairs of the company;

4. has the ability to hire and fire employees;

5. makes decisions regarding which, when and in what order outstanding debts or taxes will be paid;

6. exercises control over daily bank accounts and disbursement records; and

7. has check-signing authority.

*Vinick II*, 205 F.3d at 7–8 (citations omitted). Emphasis is placed upon the final three factors because they identify "most readily the person who could have paid the taxes, but chose not to do so." *Vinick II*, 205 F.3d at 9.

■ As the above seven factors have been analyzed, a finding of "responsibility" is predicated upon an individual's "status, duty, and authority" within the business.

*Thomsen,* 887 F.2d at 15. A person's "duty" under the statute " 'must be viewed in light of his [or her] power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form.' " *In Re Bourque,* 153 B.R. 87, 92 (Bankr. D.Mass.1993) (quoting *Godfrey v. United States,* 748 F.2d 1568, 1576 (Fed.Cir.1984)). As expressed by the First Circuit in *Caterino:*

> Courts have explicitly given the term "responsible" a broad interpretation. They have fashioned an elastic definition predicated upon the function of an individual in the employer's business, not the level of the office held: whether the person had the power to determine whether the taxes should be remitted or paid *or* had "the final word as to what bills should or should not be paid and when." In the context of this case, "the word 'final' means significant[7] rather than exclusive control over the disbursement of funds."

794 F.2d at 5 (emphasis added, internal citations omitted). An essential factor, therefore, is "any decision-making authority over which creditor ... [the business] paid." *Vinick II,* 205 F.3d at 11; *Vinick I,* 110 F.3d at 172 (citations omitted); *Hochstein v. United States,* 900 F.2d 543, 547 (2 Cir., 1990) (citations omitted); *but see In re Coveney,* 202 B.R. 801, 806 (Bkrtcy. D.Mass.1996)("the multi-factor test has precious little to do with the question of who in the corporation has **the specific duty to pay withholding taxes**" (emphasis added)). The weight of the seven factors cited above, and other relevant circumstance, needs to lean towards such "decision-making authority" in order to hold a person "responsible" under § 6672. *Vinick II, supra.*

██ For example, the mere authority or the mechanical act of signing checks are not, in and of themselves, sufficient to establish responsibility under § 6672. Check-signing authority is nevertheless highly probative evidence that an individual possesses significant control over the financial affairs of a business. "[W]here a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of payroll ... he will generally be held 'responsible.' " *In Re Bourque,* 153 B.R. at 92 (quoting *Godfrey v. United States,* 748 F.2d 1568, 1576 (Fed.Cir.1984)). Even the discretion to issue smaller checks without the approval of a superior may demonstrate one's authority to pay the employer's withholding taxes to the IRS. *Hochstein,* 900 F.2d at 547–48; *Howard,* 711 F.2d at 734 ("Authority to pay in this context means effective power to pay. That Howard had this authority is demonstrated by the fact that he did issue small checks without Jennings' [CEO] approval on a number of occasions."); *Price,* 93–1 USTC ¶ 50,134, at 87,497 (evidence that secretary/wife of president signed checks on behalf of the company payable to creditors, had independent access to checkbook, set up a bank account for the company in order to avoid levying by creditors "suggest[ed] that Ms. Theslof did exercise significant control over the company's financial matters."). In the circumstances where it is acknowledged that the person who has been assessed under § 6672 had knowledge of the tax delinquency and the inadequacy of funds, the Fifth Circuit's following observations apply:

> Gustin also argues that he did not have the actual authority to pay the entire tax

---

**7.** "Significant" is defined as "having or likely to have influence or effect." Webster's Dictionary 1091 (10th ed.1994).

bill because his check writing authority was limited to relatively small amounts. Gustin never showed, however, that he had requested and was denied authority to pay the taxes, and the government demonstrated that he had been given authority to write checks for over the amount of $2,500.00 to other creditors. Furthermore, Gustin had a duty not to dissipate the trust, and it is undisputed that he used his check writing authority to pay other creditors during the time that money was due to the United States. The Internal Revenue Service would certainly not have objected to payment of the tax deficiency by several small checks.

*Gustin,* 876 F.2d at 492. In other words, a person otherwise responsible to pay the bills of a business is not allowed to act in manner adverse to the business's obligation to pay the withholding taxes held in trust, by either choosing to not pay the IRS or, if the authority to pay the IRS has been withdrawn or never existed, through the use of a discretionary ability to pay creditors that depletes the amount of funds available to pay the IRS. *See Vinick I and II, supra; Greenberg v. United States,* 46 F.3d 239, 243–44 (3 Cir., 1994); *Gustin,* 876 F.2d at 492; *Howard,* 711 F.2d at 734 (person found responsible was ordered by CEO not to pay taxes).

 That another individual may be "more responsible" or have more authority over the employer's financial affairs does not make one any less responsible under section 6672. *Harrington,* 504 F.2d at 1312 (holding responsible "all with responsibility and authority to avoid the default which constitutes a violation of the statute"). Similarly, an otherwise responsible person under section 6672 cannot avoid responsibility by claiming that he or she failed to pay the withholding taxes at the direction of a superior. *Greenberg,* 46

F.3d at 244; *Hochstein,* 900 F.2d at 549; *Howard,* 711 F.2d at 734; *In re Bourque,* 153 B.R. at 93.

It is unusual for a spouse or other close relative of a person in charge of a sole proprietorship or other closely held company to be found responsible, under the terms of § 6672. For example, the Seventh Circuit reversed the Eastern District Court of Wisconsin's ruling that held "responsible" the wife of the company president under section 6672, in light of the following factual circumstances:

> Mrs. Holcomb was a temporary telephone operator, filling in for a sick employee, and never performed any work for Lakeshore until the fall of 1968, some six months before its demise; that while she had been Vice President since its incorporation she was neither an organizer, a director or a stockholder of the Company. She never worked on, handled, signed or filed any corporate tax returns, payrolls or withholding reports; she made no basic decisions, and there is no proof that she had any knowledge of the withholding taxes being unpaid, although she knew that Lakeshore was in financial trouble, as any wife would know under the circumstances here. It is true that "toward the end" of the operation she did sign a few checks; however, no showing was made of the purposes, the amounts, the dates, nor that any withholding taxes were past due at the time she signed the checks.

*Holcomb v. United States,* 543 F.2d 1185, 1187–88 (7 Cir., 1976); *see also In Re Chambers,* 131 B.R. 818, 826 (Bankr. N.D.Ill., 1991) *aff'd in part and rev'd in part on other grounds* 140 B.R. 233 (N.D.Ill.1992)(alleged debtor was secretary and part-time employee with no voice in corporate decision making who signed two checks for aggregate amount of less than

$200, and only when other signatories were unavailable). And in a factually similar case to the one presently under consideration, the District of Hawai'i reversed an IRS assessment that the wife of one of the owners of a restaurant was a "responsible person." *Lee v. United States*, 89–2 U.S.T.C. ¶ 9393 (D.Haw., 1989). Mrs. Lee was a mother of two children who worked a flexible schedule on the average of 15–30 hours per week and was paid modest salary of $1000 per month. *Id.* Mrs. Lee had no independent authority to sign checks and no discretion whatsoever as to which creditors to pay. *Id.* The court in *Lee* found further that:

> Ms. Lee was neither an investor nor a director in HSH, or its parent, Da Kalua Pit Corporation. Although she was secretary of HSH, and after June 19, 1978 she had the authority to countersign checks on the main HSH Bank of Hawaii account, she did not have any authority to decide which creditors were to be paid.

*Lee v. United States*, 89–2 USTC ¶ 9393, 1989 WL 90440 (D.Haw., 1989). Unfortunately, Plaintiff had significantly more involvement in the affairs of Keohan Masonry than the persons initially assessed in *Holcomb, supra, Chambers, supra,* and *Lee, supra,* and knew that the IRS was going unpaid as she signed checks to other creditors, payroll checks to herself and the other employees, and checks for personal expenses, and never inquired or attempted to use her influence to have the taxes paid.

### C. *Willfulness*

 A responsible person acts "willfully," for the purpose of imposing civil liability, if that person acts with a "reckless disregard" of a known or obvious risk of nonpayment of the taxes supposedly to be held in trust for the IRS. *Thomsen*, 887 F.2d at 17. "Liability under section 6672, thus, 'does not depend upon the presence of bad motive or the specific intent to defraud the government or deprive it of revenue.' " *Id., quoting Monday v. United States*, 421 F.2d 1210, 1216 (7 Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). The First Circuit continues to rely upon the accurate summary provided by District Judge Keeton regarding three distinctive fact patterns legally indicative of the willfulness required by the statute:

1. "reliance upon the statements of a person in control of the finances of a company ... when the circumstances show that the responsible person knew that the person making the statement was unreliable [because that other person had a known history of financial mismanagement];"

2. "failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted".

3. "continu[ing] to pay other bills ... if he fails to make reasonable inquiry as to whether money would or would not be available for payment of the taxes when they became due."

*I.R.S. v. Blais*, 612 F.Supp. 700, 710 (D.Mass., 1985) *quoted and relied upon in Vinick I*, 110 F.3d at 173 and *Thomsen*, 887 F.2d at 18–19. The second and third factors are at issue in the instant case.

### IV. *Conclusions of Law*

1. The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1340 and 1346(a)(1) and (c).

2. Venue is proper pursuant to 28 U.S.C. §§ 1396 and 1402.

 3. The court concludes as a matter of law that Plaintiff is liable to pay the Assessment at issue herein, plus interest as allowed by law, imposed upon her because Plaintiff has failed to sustain

her burden of proving by a preponderance of the evidence that she was not a "responsible person" under section 6672. Furthermore, the evidence presented at trial demonstrates by a preponderance of the evidence that Plaintiff possessed power, in both form and substance, to ensure that the trust fund taxes were paid to the IRS. Plaintiff's responsibility under section 6672 is established by a review of the totality of the circumstances, which includes, *inter alia*, her significant financial interest in the Business's income as evidenced by her salary and her ability to withdraw funds from the business account for personal expenses, the independent authority that she possessed and exercised over the allocation of Keohan Masonry's funds to both pay certain creditors and to pay for personal expenses, and her demonstrated power to influence which creditors of Keohan Masonry would be paid. As her dealings with Mr. Cathcart show, had Plaintiff considered Keohan Masonry's withholding obligations a priority, she could have influenced Keohan Masonry to pay its tax obligations.

4. The court further concludes as a matter of law, and Plaintiff has admitted (Tr.(2nd Day) at 30), that Plaintiff's failure to ensure that the taxes were paid was done "willfully," as that term has been interpreted for use in section 6672. As stipulated by the parties, Plaintiff knew that Keohan Masonry had become delinquent on its federal withholding tax obligations during the tax quarters at issue. Plaintiff knew, therefore, that the IRS was not being paid the money it was owed while she continued to draft and sign checks to pay other creditors and personal expenses.

5. Furthermore, the court concludes as a matter of law that Plaintiff was also "willful" in failing to attempt to use her influence to correct the Business's obvious fiscally irresponsible failure to pay to the IRS the withheld payroll taxes at issue herein.

6. To the extent that any of the foregoing Conclusions of Law constitute findings of fact, they shall be so considered.

### V. Conclusion

As Plaintiff failed to meet her burden of proving that she was not a responsible person or did not act willfully within the meaning of section 6672, it is hereby ordered and adjudged that Plaintiff is liable to the United States for the Assessment, plus interest. As of November 30, 1999, the unpaid balance of the assessment plus interest accrued from the date of assessment was $44,540.23. The court is informed that several further payments have been made to the IRS which further have reduced the initial Assessment of $70,242.92. The court directs the parties to submit a form of Judgment **on or before the close of business on Thursday, March 29, 2001** which reflects the amount of the assessed penalty and the interest due and owing as of March 30, 2001. *See Gens v. United States*, 222 Ct.Cl. 407, 615 F.2d 1335, 1339 (Ct.Cl.1980), *cert. denied*, 459 U.S. 906, 103 S.Ct. 209, 74 L.Ed.2d 167 (1982) (By settling with one party, government affected the rights of other party because 100% penalty under § 6672 is collected only once). Judgment will enter, thereafter, accordingly on March 30, 2001.