*327 HAMILTON, Senior Circuit Judge,
dissenting:
Because I believe a reasonable fact-finder, viewing the evidence in the light most favorable to Erwin and drawing all reasonable inferences from such evidence in his favor, could find that he was not a responsible person under 26 U.S.C. § 6672, I would vacate the judgment in favor of the Government and remand for trial. Accordingly, I respectfully dissent.
I.
We review the district court’s grant of summary judgment de novo. Blaustein & Reich, Inc. v. Buckles, 365 F.3d 281, 286 (4th Cir.2004). A motion for summary judgment should be granted “if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed. R.Civ.P. 56(c)(2). In determining whether a genuine issue of material fact exists in this case, precluding the entry of summary judgment in favor of the Government, we must view the evidence in the light most favorable to Erwin and draw all reasonable inferences from such evidence in his favor. Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 429, 435—36 (4th Cir.2001). We may not make credibility determinations or weigh the evidence. Id. at 435. And although we should review the record as a whole, we must disregard any evidence favorable to the Government as the moving party that a jury would not be required to believe. Id. at 436. See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). “That is, [we] should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.” Reeves, 530 U.S. at 151, 120 S.Ct. 2097 (internal quotation marks omitted).
II.
Mindful that in determining § 6672 liability, “the ‘crucial inquiry is whether the person had the “effective power” to pay the taxes — that is, whether he had the actual authority or ability, in view of his status within the corporation, to pay the taxes owed,’ ” Plett v. United States, 185 F.3d 216, 219 (4th Cir.1999), I will focus on the application of the Plett factors to the record evidence as we must view such evidence at the summary judgment stage.
I agree with the majority opinion that the first Plett factor, which asks whether the party upon whom the Government seeks to impose responsible person liability under § 6672 served as an officer or director of the company, cuts in favor of the Government. During the four quarters at issue, Erwin served as vice-president, secretary, and treasurer of GCAD, and served on its board of directors.
However, contrary to the majority opinion, I conclude that the second Plett factor, which asks whether Erwin controlled the company’s payroll, cuts in favor of Erwin. The evidence shows that Erwin did not control GCAD’s payroll during the four tax quarters at issue. First, the record contains a sworn statement by Erwin that he had no control over GCAD’s payroll. Second, there is no evidence that Erwin personally oversaw GCAD’s payroll. Third, the undisputed evidence shows that for all four quarters at issue, a professional accounting and tax service was in charge of GCAD’s payroll, including collecting with-holdings and paying such withholdings to *328 the Government.[1] And although Erwin did participate in the decision to hire such professional accounting and tax service, this circumstance is a far cry from controlling GCAD’s payroll functions.
Moreover, the fact that Erwin and the other shareholders infused capital into GCAD with instructions that the Light Brothers catch up the back withholding taxes, merely establishes that Erwin and the other shareholders did not want to see their investment in GCAD go down the drain because the corporation was not current in paying its federal withholding taxes. Accordingly, such infusions and instructions, which Erwin admitted during his deposition, are not inconsistent with Erwin’s later sworn statement that he had no control over GCAD’s payroll. Similarly, Erwin’s seizure of control over GCAD’s payroll functions after the tax periods at issue and after he learned of the payroll withholding delinquencies for those periods reasonably suggests that Erwin decided to become the responsible person under § 6672 from then forward in order to protect his substantial investment. Contrary to the majority opinion, such conduct does not require an inference that Erwin was a responsible person under § 6672 for the tax periods in question.
Moving on to the third Plett factor, such factor cuts in favor of Erwin. Specifically, a reasonable jury could find that Erwin had limited decision-making authority about which creditors to prefer. For the most part, any creditor preferences made by Erwin during the tax periods at issue were made with infusions of investor capital. The record also contains the sworn statement of Erwin that, prior to October 1999, he had limited, to no decision-making ability, about which creditors of GCAD to prefer.
When the evidence is viewed through the proper summary judgment lens, the fourth Plett factor also cuts in favor of Erwin. Specifically, the record shows that he did not participate in the day-to-day operations of GCAD. First, the record contains the sworn statement of Erwin that, prior to October 1999, he had no responsibility for the day-to-day management of GCAD.[2] Moreover, the evidence in the record supports the reasonable inference that, during the four quarters at issue, with the exception of all aspects of accounting and payroll, Pintner was solely responsible for the day-to-day operations of GCAD. Indeed, “Pintner came to GCAD upon the recommendation of various corporate officers of Golden Corral who presented him as a seasoned operator of the Golden Corral concept.” (J.A. 1077). The evidence supports the reasonable inference that, during the four quarters at issue, the Light Brothers were solely responsible for all aspects of accounting and payroll, including financial reporting to Pintner and, by extension, the GCAD shareholders. While Erwin’s activities on behalf of GCAD, for example, the negotiation of leases and the choosing of site locations for the restaurants, show that he was more than a passive investor, they do not establish that he participated in the day-to-day operations of GCAD. Moreover, the fact that Erwin reviewed GCAD’s sales figures *329 on a weekly basis can support the reasonable inference that he did so to monitor the status of his investment. It does not require the inference, as the majority suggests, that Erwin participated in GCAD’s day-to-day management.[3]
The fifth Plett factor, which asks whether Erwin had check writing authority, also favors Erwin.[4] The evidence is undisputed that Erwin did not possess the power to sign checks during the four quarters at issue, nor was he a signatory on any of GCAD’s bank accounts during such quarters. The focus of this factor is whether the individual at issue possesses check-writing authority, because the lack of such authority suggests that he is not a responsible person under § 6672.
Finally, the sixth Plett factor, which asks whether Erwin had the ability to hire and fire employees cuts both ways.[5] On the one hand, the undisputed evidence shows that Erwin substantially participated in the hiring and firing decisions with respect to GCAD’s top management, including hiring the Light Brothers. On the other hand, the evidence shows that Erwin did not participate at all in routine personnel decisions.
Examining the Plett factors in toto, in my considered opinion, Erwin has proffered sufficient evidence to stave off the Government’s motion for summary judgment. More specifically, when the evidence in this case is viewed in the light most favorable to Erwin, and all reasonable inferences are drawn in his favor, a reasonable fact finder could find, under the totality of the circumstances, that Erwin was not a responsible person with respect to GCAD’s withholding taxes for the last quarter of 1998 and the first three quarters of 1999 — ie., Erwin did not have the effective power to pay those taxes during those quarters.
My view is substantially supported by the First Circuit’s decision in Vinick v. United States (Vinick II), 205 F.3d 1, 9 (1st Cir.2000), which is not cited by either party. In Vinick II, the Government assessed a nearly $50,000 penalty against Arnold Vinick (Vinick) pursuant to § 6672. Id. at 5. The assessment alleged failed withholding payments for the last three quarters of 1989 and the first two quarters of 1990 with respect to Jefferson Bronze, Inc. (Jefferson Bronze). Id.
Vinick paid a small portion of the penalty and filed a claim for a refund. Id. at 6. After the Government denied the claim, Vinick sued for a refund. Id. The Government counterclaimed for the balance due and moved for summary judgment. Id. at 6. The district court granted summary judgment for the Government, and Vinick appealed. Id. The First Circuit reversed and remanded for further proceedings. Vinick v. Comm’r of IRS (Vinick I), 110 F.3d 168 (1st Cir.1997). Following a bench trial, the district court again ruled in favor of the Government by finding Vinick to be a responsible person. Vinick *330 II, 205 F.3d at 6. The First Circuit reversed again, holding that Vinick was not a responsible person under § 6672 as a matter of law. Vinick II, 205 F.3d at 15.
Vinick was a CPA in private practice and a former IRS employee. Id. at 4. In 1981, he and two other persons (Letterman and Mayer) formed Jefferson Bronze for the purpose of operating a foundry. Id. The three men, who each owned one-third of Jefferson Bronze’s stock, personally guaranteed the Small Business Administration loan used to start-up the business and pledged their homes as collateral. Id. Letterman became president, Vinick became treasurer, and Mayer became the day-to-day manager of the foundry. Id. Soon after its formation, Jefferson Bronze began a long period of financial difficulties. Id.
The remaining relevant facts are as follows: (1) throughout the history of Vinick’s involvement in the corporation, he never gave up his accounting practice and never had an office at Jefferson Bronze; (2) although Vinick had check-writing authority on Jefferson Bronze’s checking accounts, he never signed checks prior to the company’s filing for Chapter 11 bankruptcy; (3) Vinick prepared Jefferson Bronze’s quarterly employment tax returns; (4) in 1983, Letterman fired Mayer, Letterman and Vinick acquired Mayer’s share of the corporation, and each became a half owner of Jefferson Bronze; (5) Vinick hired Ronald Ouellette (Ouellette) as the new manager; (6) Ouellette ran the office and the foundry, and his wife worked part-time as the bookkeeper and signed the company checks and payroll returns; (7) Vinick occasionally would visit the Ouellette home to collect information needed to complete the quarterly returns, and after their preparation, Vinick would return the completed, unsigned forms to the Ouellette home; (8) usually once a month, Vinick would discuss with Ouellette the financial condition of the corporation and would stress to him the need to pay the taxes; (9) during Ouellette’s tenure as manager, Jefferson Bronze’s financial troubles continued, with Jefferson Bronze failing to timely pay the withholding taxes due; (10) regardless, Jefferson Bronze always filed its tax returns on time; (11) at some point, Letterman and Vinick obtained a $35,000 loan for Jefferson Bronze, which they secured with personal guarantees; (12) in 1985, Vinick negotiated with an Internal Revenue Service revenue officer a payment plan for the taxes Jefferson Bronze owed, and relayed the terms of the plan to Ouellette, who complied with the plan’s requirements; (13) after Jefferson Bronze completed payment of these taxes, it experienced no further tax delinquency until Letterman took over as manager; (14) in January 1988, Letterman decided on his own to take over as the day-to-day financial manager of the corporation (Ouelette continued as the foundry manager for non-financial matters); (15) Letterman’s wife then took over as office manager and bookkeeper; (16) during this time, Vinick continued to collect the financial information, to prepare the quarterly tax returns, and to leave them for Letterman to sign; (17) while he also continued to advise Letterman to pay the corporation’s taxes, Vinick became less involved in the financial affairs of the corporation as Letterman’s role increased; (18) in May 1988, Letterman and Vinick successfully negotiated a refinancing of Jefferson Bronze’s Small Business Administration loan with a private bank, including signing the note in their individual and corporate capacities; (19) additionally, Vinick pledged his home as collateral on the refinancing; (20) around March 1989, Jefferson Bronze became delinquent on such note, prompting Letterman and Vinick to discuss the financial future of Jefferson Bronze with the bank’s vice president; (21) *331 from April 1989 to June 1990, during Letterman’s tenure as manager and prior to Vinick’s ever having signed a company check, Jefferson Bronze again fell behind in its withholding tax obligations; (22) by July 1990, Jefferson Bronze had filed for Chapter 11 bankruptcy; and (23) a year later the bank foreclosed on the note, with Jefferson Bronze finally closing its doors shortly thereafter.
After applying virtually the same factors as we outlined in Plett to the facts just set forth, the First Circuit held that “Vinick as a matter of law was not a responsible person within the meaning of 26 U.S.C. § 6672(a).” Vinick, 205 F.3d at 15. Significant to the First Circuit’s holding, were the following facts: (1) at no time did Vinick exercise any decision-making authority over which creditors Jefferson Bronze paid; (2) during the quarters in question, Vinick had no involvement in the day-to-day operations of Jefferson Bronze; (3) during the quarters in question, although Vinick had check-signing authority, he signed no checks and lacked access to the checkbook; and (4) although Vinick participated in the decision to hire the general manager, he was not involved in the routine hiring and firing of employees. In sum, the First Circuit concluded that while Vinick “may have been more than a mere passive investor in the corporation,” the evidence did not establish that he “possessed actual, exercised authority over the company’s financial matters, including the duty and power to determine which creditors to pay,” and therefore, “as a matter of law he cannot be a responsible person.” Id. at 14-15.
While I do not suggest here that, under the facts of the present case, Erwin, as a matter of law, cannot be a responsible person under § 6672, I do believe that, based on the evidence in this case, a reasonable jury could find that that he is not a responsible person under § 6672. The facts in Vinick are substantially similar to the facts in the present case. Like Vinick, Erwin was a one-third shareholder in the corporation and personally guaranteed loans for the corporation. Like Vinick, Erwin held the title of the corporation’s treasurer. Like Vinick, Erwin received financial information about the corporation from the general manager and stressed the need to keep payroll taxes current to the person responsible for actually paying such taxes. Like Vinick, Erwin participated in the hiring and firing decisions with respect to top management, but did not with respect to routine personnel decisions. Like Vinick, Erwin took actions to catch up back withholding taxes from time periods different from the ones in question (ie., Vinick negotiated a payment plan with the Internal Revenue Service, while Erwin contributed capital with an order to use the money to catch up the back withholding taxes). Finally, like Vinick, Erwin did not participate in the day-to-day operations of the corporation.
In sum, I recognize that this is a close case. However, for the reasons just set forth, I believe the scale tips in favor of Erwin at the summary judgment stage.
III.
In conclusion, I would hold the district court erred in holding that the responsible person inquiry cuts in favor of the Government on summary judgment. Accordingly, I would not reach the willfulness element and would vacate the judgment in favor of the Government and remand for trial.

. Indeed, even the majority recognizes that "Erwin and his two partners did not directly manage GCAD's payroll.” Ante at 321.

. As the record evidence must be viewed at the summary judgment stage, Erwin gave no deposition testimony that is inconsistent with his later sworn statement that he had "no responsibility for the day-to-day management of” GCAD. (J.A. 1081). Accordingly, reliance on such statement in the mix of evidence carrying Erwin’s burden in successfully opposing the Government’s summary judgment motion is not misplaced as suggested by the majority. Ante at 325 n. 7.

. I note that the majority opinion mentions that Pintner testified in deposition that he spoke to Erwin daily regarding sales figures and the performance of individual stores. See ante at 317-18 n. 2. Because this testimony is inconsistent with Erwin’s testimony that he only spoke with Pintner about such matters on a weekly basis, Pintner’s version cannot be considered in assessing the propriety of the Government’s summary judgment motion. Edell & Assocs., P.C., 264 F.3d at 429.

. For purposes of clarity, I note that Plett itself lists check-writing authority as the fifth of six factors serving as indicia of the requisite authority to pay a company's payroll taxes, while the majority opinion in the present cases lists it as the sixth factor.

. The majority opinion lists this as the fifth Plett factor.